Hutsell *v.* Citizens' Nat. Bank *et al.*

(*Knoxville,* September Term, 1933.)

Opinion filed Nov. 18, 1933.

Jones & Davis, for E. O. Hutsell.

D. Sullens Stuart and Frank K. Boyd, for Citizens' National Bank *et al.*

Mr. Justice McKinney delivered the opinion of the Court.

This suit involves the right to the proceeds of a $10,000 policy, issued in 1927 by the Volunteer Life Insurance Company on the life of Lillian Earnestine Hutsell, daughter of complainant. The policy provides that, upon the death of insured, if the policy is in force, subject to the conditions and provisions contained therein, the company will pay said above sum to ''Ernest Olen Hutsell, Father, if living, if not, to the Executors, Administrators, or Assigns of the insured.'' It further provides:

''This policy is issued with the express understanding that the insured may, without notice to or consent of the beneficiary, exercise every right, enjoy every privilege, and receive every benefit provided for by its terms, as fully as if no beneficiary were named herein; provided the right to change the beneficiary shall not have been specifically revoked in writing by the insured and acknowledged by endorsement hereon by the Company.

''No assignment of this policy shall be binding on the Company unless and until such assignment shall be in writing and verified under oath and the original, or a

verified copy thereof, filed with the Company at its Home Office and its receipt duly acknowledged. The claim of any assignee shall be subject to proof of insurable interest and to any indebtedness to the Company secured by this policy, whether incurred before or after receipt of notice of assignment. The Company will not assume responsibility for the validity of any assignment.''

The policy provided double indemnity if insured met her death by accidental means.

The insured, who was twenty-eight years of age, committed suicide by shooting herself with a pistol about noon on October 16, 1929. There are circumstances from which it may be inferred that she endeavored to make it appear that she was accidentally shot, thus increasing the liability of the company to $20,000. The above policy was the only one she had on her life. Insured had been employed by the defendant bank for two years as bookkeeper, and by manipulating the books had succeeded in defrauding the bank of $24,000. Dodson, the cashier, discovered irregularities in her books on the night of October 15. The next morning President Lockmiller accosted her about these irregularities, and she admitted a shortage of $1,000. The cashier, Dodson, also had a conference with her, and she stated to him that her shortage was $2,000. Being advised that she could no longer work for the bank, she stated to Lockmiller that she would kill herself. Insured left the bank, purchased pistol cartridges, went to her home, and shot herself. Before doing so, however, she wrote and mailed a letter to the cashier of defendant bank, which was received the next day after her death, and which is as follows:

''Mr. Dodson: The amount I owe the bank is exactly $24,000. I had Chilhowee Mills sheet out too. I spent most of the money on the Hamptons and my family.

"My insurance will pay the $20,000, and the other $4,000 can be gotten from selling some of this junk I have, or from the Bus Co. I wish you would explain affairs to dad and take over the things and straighten them up yourself. This Harmon house that I live in is supposed to have a sleeping porch, stucco up around the front porch, and this porch extended out to drive the car under. I have paid him all but $400 for this by entering deposits on his sheet, also the work he is doing on the farm is paid for.

"I wish you could keep all that I have done from the public, if possible.

"Also phone Mr. Gates with the Southern Auto Supply Co. and cancel my order with him.

"I have some notes and papers in the black fold in my drawer at my desk at the bank, also my insurance policy is in there.

"I don't owe any accounts out in town at all. My box is 55 and you will find a marriage certificate in there. Euel Brown and I have been married in name only for some time. He knows nothing about this. He has promised that if I die before he that he will not say anything about our marriage—so please destroy the certificate as it would only disgrace him.

"I am sorry that I did all this because you and Mr. Lockmiller trusted me.

"One more thing—that note in the bank for $675 with grandfather Hutsell's name on it is a forgery. He knows nothing about it.

"There is just one thing I want to beg you to do, please don't tell anybody. I guess they will find it out tho'.

"LILLIAN H."

■ The chancellor and the Court of Appeals erroneously held that this letter constituted an equitable as-

signment of the policy to the bank. At common law an assignment of a chose in action is illegal. Such assignments, however, were given effect by courts of chancery, and hence were denominated "Equitable Assignments."

In 2 Ruling Case Law, page 614, it is said:

"Since equity disregards mere form, no particular words or particular form of instrument is necessary to effect an equitable assignment. Any language, however informal, if it shows the intention of the owner of the chose in action to transfer it so that it will be the property of the transferee, will amount to an equitable assignment, if sustained by a sufficient consideration, which should be a valuable and not merely a good consideration."

As to the nature of such an assignment, we quote from 5 Corpus Juris, page 840, as follows: "An assignment is a contract, and is subject to the same requisites as to validity as other contracts, such as proper parties, mutual assent, consideration, and legal subject matter."

In *Mutual Benefit Life Ins. Co.* v. *Swett,* 222 Fed., 200, 205, Ann. Cas., 1917B, 301, the Circuit Court of Appeals said:

"Whether, on account of Swett's indebtedness to the bank exceeding the amount of the policy, the assignment was in effect a change of beneficiary, is not in our judgment important to determine. However, the assignment of a policy and a change of beneficiary are not the same, but different, things. An assignment is the transfer by one of his right or interest in property to another. It rests upon contract, and, generally speaking, the delivery of the thing assigned is necessary to its validity. The power to change the beneficiary is the power to appoint. The power of appointment must be exercised in the man-

ner agreed upon in the contract of insurance. Niblack, Benefit Societies & Acc. Ins. (2 Ed.), sec. 173. Swett made an assignment of the policy. He did not exercise or attempt to exercise the power to appoint another beneficiary. His wife still remained such. She takes nothing as beneficiary, but that is because the debts, which the policy was assigned to secure, consumed the entire proceeds of the policy."

In *Cronbach* v. *Ætna Life Ins. Co.*, 153 Tenn., 362, 284 S. W., 72, the court was dealing with the mode of changing beneficiaries, and the question of assignment was not involved; hence that case is not an authority for complainant.

◼ It is generally held that a stipulation in a policy against its assignment without the consent of the insurer, or without filing a written copy with the company, is for the benefit of the latter and is good as between the parties. 14 Ruling Case Law, pages 998, 1001; 37 Corpus Juris, page 431.

◼ The rule also prevails in most jurisdictions that the acceptance of an assignment of a policy of life insurance is necessary, but may be implied from the failure of the assignee to dissent. 14 Ruling Case Law, page 1002; 37 Corpus Juris, page 430.

◼ The death of either party before acceptance is communicated causes an offer to lapse. 13 Corpus Juris, page 298; *Foust* v. *Board of Publication*, 8 Lea (76 Tenn.), 552.

◼ So assuming that the letter copied above was intended as an assignment of the policy to the bank, the insured having died before her offer was accepted, the offer lapsed, the assignment was incomplete, and the beneficiary named in the policy would be entitled to collect the insurance.

It may well be doubted whether the language employed in the letter constituted an assignment. There was no express assignment, and the insured may have acted upon a belief that her creditors were entitled to this insurance as a matter of law, or that her father would pay same.

In *Bennett* v. *Rosborough,* 155 Ga., 265, 116 S. E., 788, 792, 26 A. L. R., 1397, 1406, it was held that a letter written by insured to the beneficiary asking him to pay certain creditors, retain a designated amount, and pay the balance of the proceeds to another creditor, is not an assignment of the policy. The court said: ''The letter did not designate any particular policies, or purport to assign the policies, but was a statement by the insured having reference to a disposition of money that would be collectible on policies held by the insured after his death.''

In *Kreh* v. *Moses,* 22 Ont., 307, it was held that a written assignment to take effect after the death of the assignor does not constitute a valid assignment of the policy.

The Court of Appeals based its decisions upon *Northwestern Mut. L. Ins. Co.* v. *Joseph* (Ky.), 103 S. W., 317, 12 L. R. A. (N. S.), 439. In that case it appears that under a provision of the policy the insured on a specified date had the option of a settlement in either one of three ways. On the designated date he appeared before the general agent of the company and exercised his choice in writing, acknowledged same, and delivered it with the policy to the agent who mailed it to the company. Before it reached the company, the insured died, and it was insisted that the agreement was incomplete and the policy still in force. The court held against this contention, and based its decision upon the fact that the company

had made an offer to the insured which he accepted before his death, and applied the general rule that an acceptance of an offer by letter becomes effective from the mailing of the letter. That case is not in point.

■ The chancellor and the Court of Appeals further held that complainant, after the death of insured, assigned said policy to the bank for a valuable consideration, and that said assignment was free from fraud, suppression of material facts, or overpersuasion. While we are bound by the concurrent finding as to any controverted facts, we are not bound by the conclusions of law which the courts announced with respect to such facts.

The insured was buried on the morning of October 18. Early in the afternoon of that day complainant came to the bank for the purpose of procuring Dodson to qualify as administrator of his daughter, which he did. As they were leaving the bank, Lockmiller requested complainant to return to the bank when he had concluded his business at the courthouse. Upon complainant's return, the following occurred, according to the testimony of Lockmiller:

"Q. 58. Now state briefly, Mr. Lockmiller, what took place in the Directors Room on this occasion—before doing so, state whether anyone was in the Directors Room except you and Mr. Hutsell? A. There was no one in the Directors Room except Mr. Hutsell and myself. We went in the Directors Room and sat down. I said, 'Ernest, I judge you feel you have had trouble enough, and you have, but you might as well know it now as later, Lillian is short in her books. I regret very much to convey this information to you;' and he said, 'How much;' and I said, 'I don't know, she told me one amount and she told Mr. Dodson one amount, and she names another amount in a letter.''

"Q. 59. What further was said regarding her shortage? A. Well, he said, 'Now I want to pay every cent she owes, I don't want anything said about this, let's above all things keep it quiet,' and I said, 'Ernest, we are not going to divulge it, if it gets out it will get out through you or your family, we are not going to divulge it.' I said, 'Ernest, she has an insurance policy here, made to you as beneficiary, I want you to sign over your right and interest, whatever they be, to the Citizens' National Bank to protect them against any shortage through oversight or intent.' He said, 'I will be very glad to do it,' and I went and got the policy, took it in the Directors Room and read to him what I had written on that policy, and he gladly signed it, and I called a witness in to witness the signature."

Dodson testified that, when complainant came out of the directors' room, he said to him: "'How much will this amount to?' I says, 'I don't know, we will have to have an audit made.' He says, 'It will not amount to very much, will it?' I says, 'I don't know.'"

As a matter of fact, at the time these inquiries were made by complainant, Dodson and Lockmiller had received and read the letter of insured in which she admitted her shortage to be $24,000, which largely exceeded the value of the policy, and they had every reason to believe that the shortage was at least as much as was stated in the letter. This fact was not disclosed to complainant until after he had executed a receipt for and indorsed the check for said insurance to the bank some eight days later. The assignment is as follows:

"As beneficiary of the within policy No. 83610, I herewith transfer all my right, title, and interest in the above numbered policy to the Citizens National Bank, Athens,

Tennessee, McMinn County, to protect them against any shortage in the books or accounts of bank through any error or intent of Lillian Hutsell, deceased."

Complainant testified that Dodson and Lockmiller stated to him that all his daughter owed the bank was the $675 note (referred to in the letter), which he agreed to pay; that he affixed his name to the assignment without reading it, assuming that he was only doing what was necessary to enable the bank to collect the policy for him as it had agreed to do.

The check from the insurer was received on October 25, 1929, and was indorsed by the complainant on the 26th, at which time the bank issued to him the following receipt:

"Received of Ernest Oland Hutsell check for $10,000, received by him from Volunteer State Life Insurance Co. in payment of policy for like amount on life of Lillian Hutsell, deceased. This is delivered to said bank to protect them against any shortage by said Miss Lillian Hutsell. After books are checked and amount ascertained any money of said $10,000 left after taking care of said mentioned shortage shall be returned to Ernest Oland Hutsell.

"CITIZENS NATIONAL BANK,
"By G. F. LOCKMILLER, President."

Complainant testified that he indorsed the check as requested, thinking the fund would be credited to his account; that he put the above receipt in his pocket without reading it, thinking it was a deposit slip. A few minutes after leaving the bank he pulled the receipt out of his pocket, and was advised as to its contents. He then consulted counsel, returned to the bank, and demanded the check, which was declined. This is denied by the two

officials named herein, but they admitted that insured returned shortly and asked the name of the bank on which said check was drawn, and that they told him they did not remember. They also admitted that they did not divulge to complainant the contents of said letter until after said check had been indorsed and delivered to the bank. The bill herein was filed that evening, and the payment of the check stopped. Later, by agreement, the bank was permitted to collect same upon the execution of an indemnity bond, which was furnished with the United States Fidelity & Guaranty Company as surety.

We are of the opinion that it was the duty of the bank to disclose to complainant the contents of said letter. The complainant did not owe the bank any sum, and was in nowise bound to it for the defalcation of his daughter. The questions which he asked these officials indicated that he had in mind a shortage that would only absorb a part of the insurance. When the inquiries were made as to the shortage, these officials should have disclosed the statement of the insured with respect thereto. Had the bank disclosed the letter of insured admitting a shortage largely in excess of the insurance, we cannot say that complainant would have assigned said policy to the bank. The bank should have divulged all of the facts to complainant, and its failure to do so constituted fraud in law. The assignment and receipt were so worded as to carry an inference that the insurance exceeded the shortage, while at the time the draftsman knew, or at least had reason to believe, that the reverse was true.

In 50 Corpus Juris, pages 55, 56, it is said:

"Subject to the rules relating to concealment as fraud generally, particularly as a ground for avoiding a contract, it is a well settled rule that, if, at the time a con-

tract of suretyship is executed, the obligee conceals or withholds from the surety material facts affecting the risk, which are within his knowledge and which it is his duty to disclose, whereby the surety is induced to execute the contract, it constitutes such fraud as will entitle the surety to avoid his contract; especially where the obligation of suretyship is entered into at the request of the person to whom the security is given. This rule applies, even though the undue concealment is not willful or intentional, nor made with a view to any advantage to the creditor or obligee, provided it operates to the prejudice of the surety; and has been held to apply, although the suretyship contract is made upon a sufficient consideration.''

In 12 Ruling Case Law, page 307, it is said:

''Though generally mere silence does not amount to fraud, there are times and occasions when it becomes the duty of a person to speak, in order that the party he is dealing with may be placed on an equal footing with him; and when a failure to state a fact is equivalent to a fraudulent concealment, and amounts to fraud equally with an affirmative falsehood.''

And on page 309, it is said: ''Where one responds to an inquiry it is his duty to impart correct information, and he is guilty of fraud if he denies all knowledge of a fact which he knows to exist, or if he gives equivocal, evasive, or misleading answers calculated to convey a false impression, even though literally true as far as they go, or if he fails to disclose the whole truth.''

The conclusions announced herein are predicated upon the facts as found by the chancellor and the Court of Appeals. In other words, treating the testimony of the two bank officials as true, we think their failure to in-

form complainant as to the amount of the shortage, as set forth in the letter of Miss Hutsell, constituted constructive fraud, or fraud in law, that would entitle complainant to a decree. Miss Hutsell was the bookkeeper, and knew better than any other person the amount of the shortage. Complainant had implicit confidence in his daughter, and a disclosure to him of the contents of said letter would have convinced him that the entire proceeds of the policy would be inadequate to cover her defalcation, and that an assignment of the policy to the bank would amount to a surrender of all interest therein.

There is no material variance between the pleadings and the proof so far as complainant is concerned, and the prayer of the bill is consistent with the theory upon which a recovery is asked.

It is contended that complainant should not have a decree because he failed to allege in his bill that the suppression of said letter until after he had indorsed and delivered the draft to defendant constituted a constructive fraud. The bill alleges that defendant did not advise him of the shortage of $24,000 until he had indorsed and delivered the draft to it. The answer admits the receipt of Miss Hutsell's letter the morning after her death and before it had any transactions with her father. Complainant is entitled to the benefit of any admissions contained in the answer. From these pleadings it appears that the bank had notice of a defalcation amounting to $24,000, which it did not disclose to complainant, notwithstanding his inquiry with respect thereto, until after his assignment of the policy and indorsement of the check had been obtained. As to whether these facts, which are not controverted, constitute fraud, is a question of law. The bill charges generally that complain-

ant was in a distressed state of mind, was ignorant, had implicit confidence in the bank officials, agreed to pay a $675 note and a small overdraft in his daughter's account, but had no intention of assigning his entire interest in said policy, and that he was overreached in the matter. The bill was drawn hurriedly in order to stop the payment of the draft, and the facts were not detailed with particularity. Upon the filing of the answer much proof was taken.

The question of withholding from complainant the amount of shortage divulged in Miss Hutsell's letter was made an issue, and was explained by the bank officials, their position being that, in stating to complainant that they did not know the amount of the shortage, they were telling the truth, and considered it unnecessary to exhibit said letter to complainant. All of the facts connected with the transaction were developed in minute detail, and the defendant was neither misled nor surprised in any manner. The chancellor, in a very elaborate opinion, treated this question as one of the leading issues in the cause, and dealt with it specifically, both as to law and fact. The Court of Appeals also considered the question, and in neither court was the insufficiency of the pleadings to raise this issue suggested nor dealt with. The defendant has filed no petition for *certiorari,* and cannot therefore challenge the sufficiency of the pleadings in this court. But, even had it done so, the rule announced in the fifth syllabus in *Bartee* v. *Tompkins,* 4 Sneed (36 Tenn.), 623, would entitle complainant to the relief sought. That rule is as follows:

"As a rule of practice, the Chancellor should grant no relief upon any matter which does not appear distinctly in either the bill or answer. But where a bill con-

tained a prayer for general relief, and rested the complainant's claim thereto upon a prominent ground which was not maintained in the proof, and it appeared that the bill and the answer contained a full and distinct history of the transactions in controversy between the parties, which upon the hearing disclosed other grounds of equitable relief, the Court should proceed to adjust the equities between the parties as if such grounds had been specifically relied on.''

The question as to whether this assignment was supported by a valuable consideration is one that is not free from doubt, but which we find unnecessary to determine, in view of our conclusions heretofore announced.

There is a suggestion in the brief of defendant that the funds of the bank were used in paying the premiums on said policy. Neither of the other courts so held, and, as previously stated, defendant has filed no petition for *certiorari.*

Miss Hutsell was bonded in the sum of $5,000, which, of course, was wholly inadequate to cover her shortage. While it is unfortunate that the bank must sustain such a large loss on account of the wrongs committed by this trusted employee, we are unable to sustain its claim to the entire proceeds of the policy.

The writ of *certiorari* having heretofore been granted and argument heard, it follows that the decree of the Court of Appeals will be reversed and a decree entered in this court in favor of complainant for the $10,000 collected on the policy, less the note of $675, with interest, and the overdraft of $295.

This case is a difficult one, and the claim of the bank is not without equity. But, from a careful consideration of the evidence, we cannot escape the conclusion that the

complainant did not freely and with full knowledge of all the facts known by the bank's officers assign to the bank his entire interest in this policy. The bank will not be charged with any interest on the proceeds from the policy, and will not be allowed any interest on the item of overdraft. The costs will be divided equally.