# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

FILED

October 21, 1998

Cecil W. Crowson
Appellate Court Clerk

FREDERIC B. INGRAM,  )
  )
　Plaintiff/Appellee,  )
  )  Davidson Chancery
VS.  )  No. 94-842-III
  )
  )  Appeal No.
WILLIAM F. EARTHMAN,  )  01A01-9510-CH-00439
  )
　Defendant/Appellant.  )


APPEAL FROM THE CHANCERY COURT FOR DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE


THE HONORABLE ROBERT S. BRANDT, CHANCELLOR


For the Plaintiff/Appellee:

James V. Doramus
Gregory Mitchell
Doramus & Trauger
Nashville, Tennessee

For the Defendant/Appellant:

Maclin P. Davis, Jr.
H. Buckley Cole
Jonathan Cole
Baker Donelson Bearman & Caldwell
Nashville, Tennessee


## AFFIRMED AND REMANDED


WILLIAM C. KOCH, JR., JUDGE

# O P I N I O N

This appeal involves a dispute between two former friends and business associates over a sizeable personal debt. After one of the friends failed to repay a $1,700,000 loan, the friend who had loaned the money filed suit in the Chancery Court for Davidson County seeking to recover the loan and interest. The borrower asserted that the lender had delayed too long in filing suit and counterclaimed for allegedly unpaid compensation and retirement benefits. A jury awarded the lender $5,667,122.84 on the debt, and the trial court, with the parties' consent, awarded the lender an additional $400,000 for his legal expenses. On this appeal, the borrower raises numerous issues relating to the denial of his motions for directed verdict, the adequacy of the jury instructions, the instructions limiting the use of the evidence of the lender's prior criminal conviction, and the excessiveness of the verdict. We have determined that the judgment should be affirmed.

## I.

Frederic B. Ingram and William F. Earthman became acquaintances in the early 1960's. Mr. Ingram was the scion of a prominent, wealthy Nashville family. Mr. Earthman was the young, fast-rising president of Nashville's Commerce Union Bank,[1] one of a group of banks extending credit to the Ingram Corporation. Mr. Earthman had been the bank officer assigned to the Ingram Corporation accounts for several years and had developed a cordial business relationship with Mr. Ingram's father. The business dealings between the two men ripened into a close personal relationship between the two men and their families.

In 1970 Mr. Earthman was elected chief operating officer of Tennessee Valley Bancorp, the holding company that owned Commerce Union Bank. He retained his position as president of Commerce Union Bank. Despite the outward appearance of financial success and security, Mr. Earthman's personal finances were burdened by large medical expenses associated with a chronic mental illness of one of his children. Mr. Earthman was struggling to keep up with these expenses, and in September 1972,

---

[1]Commerce Union Bank was later acquired by Sovran Bank. Sovran Bank, in turn, was acquired by NationsBank. For the sake of consistency, we will refer to the bank as "Commerce Union Bank" because the ownership of the bank plays no direct role in the resolution of the issues involved in this appeal.

he turned to Mr. Ingram for help. Mr. Ingram agreed to loan Mr. Earthman $600,000 for six months, and Mr. Earthman executed a note made payable to Mr. Ingram bearing an interest rate of 5½%. Mr. Earthman was unable to pay the note when it came due, but Mr. Ingram did not insist on being repaid as long as Mr. Earthman continued to pay the interest accruing on the note.

In the early 1970's, the Ingram Corporation decided to pursue a lucrative sludge-hauling contract with the sanitary district serving Chicago and surrounding communities. Sometime before the fall of 1974, a federal grand jury in Chicago began looking into how the Ingram Corporation had secured the contract and how it had obtained favorable modifications to the contract. The grand jury eventually indicted Mr. Ingram and other business associates for paying more than $900,000 in bribes to an Illinois legislator and other city officials. In November 1977, following a nine-week trial, Mr. Ingram was convicted of authorizing political payoffs and was sentenced to imprisonment for four years. Mr. Earthman attended portions of the trial to support Mr. Ingram.

Mr. Ingram remained free on bond pending the appeal of his conviction. In 1978, he and his brother decided to divide the family business. Mr. Ingram formed a new entity and invited several members of the board of the former Ingram Corporation to serve on the board of his new corporation. His brother invited the remaining board members to serve on the board of his corporation. After the United States Court of Appeals for the Sixth Circuit affirmed his conviction in March 1979,[2] Mr. Ingram recruited several new board members, one of whom was Mr. Earthman. According to Mr. Ingram, he sought out Mr. Earthman because he was "an astute and honest businessman." Mr. Earthman, for his part, later stated that Mr. Ingram invited him to join the board to be "his eyes and ears" while he was in prison.

Mr. Ingram began serving his sentence in January 1980. Mr. Earthman visited him for the first time in April 1980. After the federal Parole Commission set his release date for September 1982 even though he was eligible for parole in May 1981, Mr. Ingram requested Mr. Earthman and others to assist him in seeking an earlier release from prison. Mr. Earthman enlisted the aid of a local politician, John Jay Hooker, who assisted in obtaining the services of a lawyer and a political consultant

---

[2]*See United States v. McPartlin*, 595 F.2d 1321 (7th Cir. 1979).

with governmental connections and who also contacted President Carter's chief of staff on Mr. Ingram's behalf.

Mr. Earthman visited Mr. Ingram in prison in September or October 1980 to discuss his personal financial problems caused by his child's continuing illness. He continued to be unable to repay Mr. Ingram the $600,000 he had borrowed eight years earlier, and he had accumulated large secured and unsecured debts at other banks.[3] Mr. Earthman again asked Mr. Ingram for financial assistance. Mr. Ingram desired to help his friend but made it clear that he would not incur any personal expense in doing so. Accordingly, he proposed to guaranty a $1,700,000 loan to Mr. Earthman from another Nashville bank which held a sizeable amount of Mr. Ingram's collateral. Mr. Earthman informed Mr. Ingram that he planned to use the stock options he was receiving from Commerce Union Bank to repay his personal debts.

Instead of following Mr. Ingram's suggestion, Mr. Earthman returned to Nashville and arranged for a $1,700,000 loan from United American Bank in Knoxville directly to Mr. Ingram. On October 14, 1980, he also prepared and executed a personal $1,700,000 note to Mr. Ingram, using a standard Commerce Union Bank note form. Mr. Earthman wrote "Frederic B. Ingram" in the space for identifying the lending bank and also filled in another blank stating that the note would be due "Eighteen Months after Date." With regard to the interest, Mr. Earthman checked a box signifying that the interest would be "At the Bank's 'Prime Rate' plus _____ % per year."[4]

Thereafter, Mr. Earthman mailed the note to Mr. Ingram's assistant in New Orleans. United American Bank wired the loan proceeds to Mr. Ingram's personal account at a New Orleans bank. On October 24, 1980, the $1,700,000 was transferred to Mr. Earthman's account at a New York bank. Three days later, Mr. Earthman used $600,000 of the proceeds to repay Mr. Ingram's 1972 loan.

---

[3]In late 1980, Mr. Earthman's debts to other banks were between $1,050,000 and $1,291,000.

[4]The standard form note defined the term "prime rate" as follows:

Prime Rate means the Bank's rate for loans to its most credit worthy customers for 90-day unsecured loans. At the time of this agreement, that rate is _____% per year, although it will change from time to time. If a change in the Prime Rate occurs, the interest on my loan may be adjusted upward or downward.

Mr. Ingram received word in late December 1980 that he had been granted a presidential commutation enabling him to be released from prison in May 1981. Following his release, Mr. Ingram pursued discussions with Mr. Earthman about Mr. Earthman's leaving Commerce Union Bank and working full-time for the Ingram Corporation. The two men also discussed in general terms the possibility that Mr. Ingram might forgive Mr. Earthman's $1,700,000 loan out of gratitude for his efforts in helping secure Mr. Ingram's early release from prison.

With regard to the offer of employment with the Ingram Corporation, Mr. Earthman told Mr. Ingram that leaving Commerce Union Bank would depend on obtaining the bank board's approval of his early retirement and that it could take several years to work this out. In the meantime, Messrs. Ingram and Earthman agreed that Mr. Earthman would become the "managing director" of Ingram Worldwide Investments, Ltd. On September 23, 1981, Mr. Ingram provided Mr. Earthman with a letter agreeing to pay Mr. Ingram supplemental retirement benefits in return for his services to the Ingram Corporation and other related corporations. The purpose of this agreement was to compensate Mr. Earthman for the difference between the amount of his early retirement benefit from the bank and the amount of his regular retirement benefit if he retired at the age of sixty-five. In the letter, Mr. Ingram agreed to pay the supplemental retirement benefits himself if the Ingram Corporation did not make them because of "the Board's not having authorized and approved this agreement."

In mid-December 1981, Mr. Ingram renounced his United States citizenship and became a citizen of Ireland. He explained later that he took this step for tax reasons, but Mr. Earthman added that Mr. Ingram was also angry about his treatment by the federal government. In late 1981 or early 1982, Mr. Ingram established several trusts in Liechtenstein and placed his personal assets, valued at between $100,000,000 and $150,000,000, in the hands of the professional trustees retained to manage the trusts. On January 26, 1982, Mr. Ingram executed an assignment in blank of Mr. Earthman's note and forwarded the original note and the incomplete assignment document to a Swiss lawyer who was serving as a trustee of the Liechtenstein trusts.

Following their discussion in mid-1981, Mr. Earthman continued to find ways to induce Mr. Ingram to forgive his $1,700,000 debt. During a telephone

conversation in early January 1982, Mr. Ingram's New Orleans lawyer and Mr. Earthman's New York lawyer discussed various possible forms for the gift including a testamentary gift to Mr. Earthman's children and an outright inter vivos gift. They reached no conclusion because of the unresolved question about the tax consequences of this gift to Mr. Ingram.

In April 1982, Mr. Ingram received word that the $1,700,000 note in his name at United American Bank was about to come due. Mr. Earthman informed Mr. Ingram that he was unable to repay the loan and that he had made arrangements for United American Bank to renew the loan. Four months later, when it encountered federal regulatory problems of its own, United American Bank called upon Commerce Union Bank to purchase Mr. Ingram's loan. Despite the fact that Commerce Union Bank's loan committee had declined to purchase Mr. Ingram's note, a high ranking bank officer authorized the purchase of the note after Mr. Earthman assured him that "the loan will be out of the bank in a few days." Accordingly, Commerce Union Bank purchased Mr. Ingram's United American Bank note and placed the current amount of the loan and accumulated interest – $2,540,527.46 – on its own books as a personal loan to Mr. Ingram.

On December 1, 1982, Commerce Union Bank debited Mr. Ingram's account for a $66,333.99 interest payment and then sold the loan to a Cayman Island bank named Banque d'l Union Europeene for $2,606,863.45. As a condition to the sale, the Banque d'l Union Europeene required Commerce Union Bank to execute an agreement to repurchase the loan if it was not paid off before May 15, 1983.

On March 29, 1983, Commerce Union Bank's internal auditor and Mr. Earthman discussed the $2,540,527.46 personal loan to Mr. Ingram as well as two other personal loans to others that Mr. Ingram had guaranteed. The auditor explained that there was an "appearance problem" with these loans because they had been made while Mr. Earthman served on the Ingram Corporation's board of directors. Two weeks later, Mr. Earthman had a similar conversation with the chairman of the loan audit committee. During neither conversation did Mr. Earthman reveal that he had received the proceeds of Mr. Ingram's loan.

As the payment date for Mr. Ingram's loan approached, the Banque d'l Union Europeene called upon Commerce Union Bank to repurchase the loan in accordance

with the buy-back agreement. Mr. Earthman still lacked the funds to pay the note and accumulated interest[5] and understood that having the bank purchase the note could jeopardize his position with the bank. Accordingly, he asked Mr. Ingram to pay the note. Mr. Ingram expressed displeasure at being required to raise such a large amount of money on short notice in order to prevent embarrassment to Mr. Earthman and Commerce Union Bank. However, on May 6, 1983, Mr. Ingram paid Banque d'l Union Europeene $2,729,675.95 to retire the loan after Mr. Earthman promised him that he would repay the loan as soon as he could.

Mr. Earthman's career at Commerce Union Bank was nearing an end in mid-1983. He had already accepted full-time employment with the Ingram Corporation when he negotiated a $200,000 per year consulting contract with Commerce Union Bank without informing Mr. Ingram. On May 31, 1983, Mr. Earthman resigned as president of Commerce Union Bank and as chief executive officer of Tennessee Valley Bancorp effective on June 30, 1983. He remained on Commerce Union Bank's board and accepted the title of chair of the executive committee.

On June 19, 1983, Mr. Earthman signed an employment contract with the Ingram Corporation in which Ingram agreed to pay him $300,000 per year in salary and an additional $100,000 per year in deferred compensation. Mr. Earthman's combined income from the Commerce Union Bank consulting contract and from the Ingram Corporation far exceeded the salary he had been earning as president of the bank and chief executive officer of the bank holding company.

Mr. Earthman went to work for the Ingram Corporation on July 1, 1983. As one of his first assignments, Mr. Earthman traveled to London at Mr. Ingram's request to examine the soundness of the business and investment practices of Tampimex, an Ingram subsidiary. Two months after Mr. Earthman reported that Tampimex's internal controls were sound, Tampimex lost approximately $100,000,000 because its internal controls failed to respond to a downturn in the oil market. Tampimex's failure caused Mr. Ingram to sell off the Ingram Corporation assets and to disband the company. Tampimex's creditor banks also directed Mr. Ingram to reduce Mr. Earthman's salary from $300,000 to $100,000.

---

[5]In addition to his debt to Mr. Ingram, Mr. Earthman's secured and unsecured debt at the time was between $775,000 and $1,305,000.

Mr. Earthman formally retired from Commerce Union Bank in February 1985. During the same month, Mr. Ingram received a telephone call from Mr. Earthman's Nashville lawyer seeking information about Mr. Earthman's activities with regard to Mr. Ingram's accounts at Commerce Union Bank. The lawyer informed Mr. Ingram that the bank had appointed a special committee to review Mr. Earthman's activities while president and chief executive officer with regard to Mr. Ingram's loans and that the bank was considering canceling Mr. Earthman's $200,000 per year consulting contract, withdrawing his retirement package, and rescinding his stock options. Mr. Ingram informed the lawyer that Mr. Earthman had received the proceeds of one of the loans being questioned by the bank.

Several days later, Mr. Earthman visited Mr. Ingram in London and expressed concern about his precarious position with the bank. Within a month, however, Mr. Earthman exercised the stock options he had accumulated while working at the bank and earned between $4,000,000 and $5,000,000. Mr. Earthman did not inform Mr. Ingram that he had exercised these options and did not use any of the proceeds to repay his October 1980 debt to Mr. Ingram.

Later in 1985, Commerce Union Bank reduced Mr. Earthman's consulting contract from $200,000 per year to $100,000. Mr. Ingram also informed Mr. Earthman that "there . . . [was] nothing more he could add to the Ingram Corporation" and requested his resignation. Mr. Earthman submitted his letter of resignation from the Ingram Corporation on October 30, 1985. The other directors of the Ingram Corporation later resigned, and the company eventually went out of business as a result of Tampimex's financial reversals.

Mr. Earthman's resignation from the Ingram Corporation did not end his relationship with Mr. Ingram. At Mr. Ingram's request, he remained on the board of directors of Arcata Corporation, a printing and wood products company in which Ingram Worldwide Investments had purchased an 8% interest in 1982. One of the plans for Arcata was to break up the company and sell its assets to Japanese buyers. Mr. Ingram believed that Mr. Earthman could play an instrumental role in this process because of his contacts with Japanese businessmen and agreed to pay Mr. Earthman $10,000 per month to continue to serve on Arcata's board. Arcata also contracted with Mr. Earthman's Cayman Island consulting company to serve as its "financial advisor" with regard to its negotiations with the Japanese. Mr. Ingram and

Mr. Earthman anticipated that Mr. Earthman could earn a commission of as much as $8,000,000 if he engineered the sale of Arcata and that he would use a portion of this commission to repay his debt to Mr. Ingram.

In April and May 1987, Mr. Earthman sent Mr. Ingram a series of written proposals intended to resolve their financial relationships. Each of these proposals was based on Mr. Earthman's assumption that Mr. Ingram would agree to assume personal liability for unpaid compensation due from the Ingram Corporation and that Mr. Ingram would forgive his $1,700,000 debt. In his April 21, 1987 letter offering two alternatives, Mr. Earthman warned that the lack of a resolution of the compensation and debt issues could "'fester' in such a way as to be detrimental to our mutual best interest." He also conceded that he could not play a "constructive role" in Mr. Ingram's business ventures following the completion of the Arcata project.

In discussions following his receipt of the April 21, 1987 letter, Mr. Ingram told Mr. Earthman that his proposals were not acceptable. He told Mr. Earthman that the assumption that he would assume the Ingram Corporation's financial obligations was "nuts" because he had already lost $100,000,000 when the Ingram Corporation failed and because he was not responsible for assuming any other corporate obligations. Despite Mr. Ingram's response, Mr. Earthman stated that he would submit a revised proposal in a more final form.

Mr. Earthman sent Mr. Ingram a revised proposal on May 21, 1987. On this occasion, Mr. Earthman proposed that they enter into a termination agreement on or before December 31, 1987 and that either Mr. Ingram or his trust forgive his debt and pay him an additional $500,000 by June 30, 1987. Mr. Ingram's response, like his response to the earlier proposal, was blunt. He informed Mr. Earthman that the proposal was "totally unacceptable in concept and every other way" and that the only thing they had to talk about was "how he was going to pay me back the money he owed me on the note." According to Mr. Ingram, the two men discussed using the commission Mr. Earthman expected from the sale of Arcata to repay the debt after Mr. Ingram insisted that they stop "worry[ing] with these silly schemes of trying to figure out a way to get me to pay some money that I wasn't obligated to pay."

After this May 21, 1987 letter, Mr. Earthman made no other formal proposals concerning the forgiveness of his debt. In April 1988, as the statute of limitations

was about to run on his debt to Mr. Ingram, Mr. Earthman told Mr. Ingram that he was still unable to repay the loan and accrued interest and that he was still relying on the Arcata commission to provide the funds to do so. He did not tell Mr. Ingram that he had exercised his stock options or that his bank stock made up $5,000,000 of his $5,520,000 net worth.

Even though Mr. Ingram replaced Mr. Earthman on Arcata's board during the Spring of 1988, Messrs. Earthman and Ingram traveled to Japan in August or September 1988 to promote the Arcata sale. While in Tokyo, they agreed that the first $2,000,000 of any commission from the sale of Arcata would be paid to the former chairman of Citibank who was assisting them with the negotiations. They also agreed that the next portion of the commission would be used to pay off Mr. Earthman's debt to Mr. Ingram and that the remaining commission would be paid to Mr. Earthman. In October 1988, after the efforts to sell Arcata did not bear fruit, Arcata informed Mr. Ingram that it would not renew its consulting contract with him.

In April 1991, Mr. Earthman enlisted Mr. Ingram's assistance in another business venture involving the sale of bottled water from a spring Mr. Earthman owned at Beersheba Springs. Because of the growing popularity of bottled water, Mr. Earthman told Mr. Ingram that the venture could earn "more than 'walking around money'" and requested Mr. Ingram to contact a friend on Coca Cola's board with the proposal. According to Mr. Ingram, Mr. Earthman offered him 40% of the venture to settle his debt. Coca Cola eventually rejected the proposal, and by early 1992, Mr. Ingram believed that Mr. Earthman was losing enthusiasm about the venture.

As 1992 wore on, Mr. Ingram became increasingly concerned about the repayment of Mr. Earthman's loan and eventually hired a Washington, D.C. law firm to look into the activities of Mr. Earthman and Commerce Union Bank during the early 1980's. In late 1992, Mr. Ingram requested a meeting with Mr. Earthman after his lawyers informed him that the bank could be liable to Mr. Ingram based on the way it handled Mr. Ingram's loans with United American Bank and the Banque d'l Union Europeene. In early December 1992, Mr. Ingram recounted his lawyer's conclusions to Mr. Earthman during a three hour meeting at the Admiral's Club in the Dallas airport. Mr. Ingram also asked Mr. Earthman to sign a statement detailing his actions with regard to Mr. Ingram's loans and suggested that this statement could force the bank to be "a 50-50 partner in paying off his obligation to me." According

to Mr. Ingram, Mr. Earthman acknowledged that he owed Mr. Ingram the money and that "it would be very useful to him if . . . [the bank] would pay part of the bill." According to Mr. Earthman, Mr. Ingram also promised him that he "could go to Zurich and pick up the note" if he signed the statement.

Shortly after the meeting in Dallas, Mr. Ingram's Washington lawyers sent Mr. Earthman's Nashville lawyer a draft of a statement for Mr. Earthman's signature. Mr. Earthman declined to sign the statement because he asserted that it was not accurate and because his lawyer advised him that signing the statement could expose him to criminal liability. With this development, Mr. Ingram decided that he had "gone the last mile" with Mr. Earthman.

In March 1994, Mr. Ingram filed a multi-count complaint against Mr. Earthman in the Chancery Court for Davidson County seeking to recover the $1,700,000 debt and accrued interest and attorney's fees. In response, Mr. Earthman admitted that he had borrowed $1,700,000 from Mr. Ingram in October 1980 and that he had not repaid the loan or paid any interest on the loan. However, he also asserted numerous defenses, including laches and the statute of limitations, and counterclaimed for $6,500,000 in unpaid compensation and retirement benefits. In response, Mr. Ingram asserted that Mr. Earthman was estopped to assert a statute of limitations defense. Both parties eventually moved for summary judgment, and the trial court dismissed all of Mr. Ingram's claims against Mr. Earthman except for the "breach of contract/promissory note" claim and declined to dismiss Mr. Earthman's counterclaim against Mr. Ingram.

Following a nine day trial, the jury deliberated less than one hour before returning a verdict finding that Mr. Earthman was estopped from relying on the statute of limitations defense and awarding Mr. Ingram a $5,667,122.84 judgment against Mr. Earthman. The jury also determined that Mr. Earthman was not entitled to receive a pension from Mr. Ingram personally. Based on the parties' agreement, the trial court also awarded Mr. Ingram $400,000 for his legal expenses. Mr. Earthman has perfected this appeal.

## II.

The first step in suits like this one is to identify the body of law applicable to the dispute. *See* Richard B. Hagedorn, *The Law of Promissory Notes* ¶ 1.05 (1992) ("Hagedorn"). This case presents two issues in this regard. The first issue concerns which version of the Uniform Commercial Code should be used to determine whether Mr. Earthman's October 14, 1980 note is a negotiable instrument. The second issue concerns whether the note is a negotiable instrument under the applicable version of the Uniform Commercial Code. If the note is a negotiable instrument, the parties' rights are governed by Article 3 of the Uniform Commercial Code; if it is nonnegotiable, we must look to the common law of contracts to define the parties' rights and remedies.

### A.

In 1990 the National Conference of Commissioners on Uniform State Laws and the American Law Institute made significant substantive revisions to Article 3 of the Uniform Commercial Code. *See* 2 James J. White & Robert S. Summers, *Uniform Commercial Code* § 16-2 (4th ed. 1995) ("White & Summers"). The General Assembly incorporated many of these changes into Tennessee's version of the Uniform Commercial Code in 1995.[6] Because Mr. Ingram's $1,700,000 loan to Mr. Earthman and Mr. Earthman's execution of the promissory note occurred in 1980, we must at the outset determine which version of the Uniform Commercial Code should be used to determine whether Mr. Earthman's note was a negotiable instrument.

The pre-1995 version of Article 3 of the Uniform Commercial Code applies to this transaction for two reasons. First, the 1995 amendments themselves state that they will take effect on July 1, 1996.[7] Second, amendatory acts that make substantive, as opposed to procedural, changes in existing law must be applied prospectively. *See Kuykendall v. Wheeler*, 890 S.W.2d 785, 787 (Tenn. 1994); *Saylors v. Riggsbee*, 544 S.W.2d 609, 610 (Tenn. 1976). Thus, like other statutes making substantive changes in existing law, we will not apply the 1995 amendments to Article 3 to a transaction occurring before the amendments' effective date. *See Resolution Trust Corp. v. Maplewood Invs.*, 31 F.3d 1276, 1286-88 (4th Cir. 1994);

---

[6]*See* Act of May 22, 1995, ch. 397, 1995 Tenn. Pub. Acts 617, codified at Tenn. Code Ann. §§ 47-3-101, -605 (1996).

[7]*See* Act of May 22, 1995, ch. 397, § 6, 1995 Tenn. Pub. Acts 617, 667.

*Bankers Trust (Del.) v. 236 Beltway Inv.*, 865 F. Supp. 1186, 1192 n.7 (E.D. Va. 1994); *Johnson v. Johnson*, 614 N.E.2d 348, 354 (Ill. App. Ct. 1993); *Woo v. Smart*, 442 S.E.2d 690, 693 (Va. 1994). Instead, we will apply the version of the Uniform Commercial Code in effect at the time of the parties' agreement and the execution of the October 14, 1980 note. *See Yin v. Society Nat'l Bank Indiana*, 665 N.E.2d 58, 62 (Ind. Ct. App. 1996).

## B.

We now turn to the question concerning whether Mr. Earthman's note is negotiable and, therefore, governed by Article 3 of the Uniform Commercial Code. Whether an instrument is negotiable is a question of law to be determined by the court. *See Northern Bank v. Pefferoni Pizza Co.*, 562 N.W.2d 374, 376 (Neb. 1997); *Cartwright v. MBank Corpus Christi, N.A.*, 865 S.W.2d 546, 549 (Tex. Ct. App. 1993); 5A Ronald A. Anderson, *Anderson on the Uniform Commercial Code* § 3-101:48 (3d ed. 1994) ("Anderson"). Using a version of the "four corners rule," the courts determine the negotiability from the face of the instrument without reference to extrinsic facts. *See Bankers Trust (Del.) v. 236 Beltway Investment*, 865 F. Supp. at 1192; *Holsonback v. First State Bank*, 394 So. 2d 381, 383 (Ala. Civ. App. 1980); *Partney v. Reed*, 889 S.W.2d 896, 900 (Mo. Ct. App. 1994). If there is any doubt that an instrument is negotiable, the courts generally find that it is nonnegotiable. *See Geiger Fin. Co. v. Graham*, 182 S.E.2d 521, 525 (Ga. Ct. App. 1971); *Pacific Fin. Loans v. Goodwin*, 324 N.E.2d 578, 580 (Ohio Ct. App. 1974); 5A Anderson, §§ 3-101:21, -104:13, at 117.

As it existed in 1980, Tennessee's version of the Uniform Commercial Code contained six requirements for negotiability. In order to be negotiable, an instrument was required to (1) be in writing,[8] (2) be signed by the maker or drawer,[9] (3) contain an unconditional promise or order,[10] (4) provide for the payment of a sum certain in

---

[8]*See* Tenn. Code Ann. § 47-3-104(1) (1979).

[9]*See* Tenn. Code Ann. § 47-3-104(1)(a).

[10]*See* Tenn. Code Ann. §§ 47-3-104(1)(b), -105 (1979).

money,[11] (5) be payable on demand or at a definite time,[12] and (6) be payable to order or to bearer.[13]  At that time, the "sum certain" provision in Tenn. Code Ann. §§ 47-3-104(1)(b), -106 required that the "computation [of interest] must be one which can be made from the instrument itself without reference to any outside source." *See* Tenn. Code Ann. § 47-3-106 cmt. 1 (1979); *Black v. Commerce Union Bank*, No. 01A01-9206-CH-00220, 1992 WL 335948, at *2 (Tenn. Ct. App. April 4, 1994) (Not for Publication).  Thus, a majority of courts construing similar provisions have held that notes containing variable interest rate terms were nonnegotiable.  *See Doyle v. Trust Sav. & Loan Ass'n*, 869 F.2d 558, 560 (10th Cir. 1989); *Northern Trust Co. v. E. T. Clancy Export Corp.*, 612 F. Supp. 712, 715 (N.D. Ill. 1985); *Johnson v. Johnson*, 614 N.E.2d at 352-53; *Centerre Bank of Branson v. Campbell*, 744 S.W.2d 490, 496-98 (Mo. Ct. App. 1988); *DH Cattle Holdings Co. v. Reinoso*, 575 N.Y.S.2d 203, 204 (App. Div. 1991); 2 White & Summers, § 17-4, at n.7.  After Mr. Earthman prepared and executed the $1,700,000 promissory note, the General Assembly amended Tenn. Code Ann. §§ 47-3-104(1)(b) and 47-3-106(1) to enable notes with variable interest rates to be considered negotiable instruments.[14]

Mr. Earthman's note did not satisfy the "sum certain" requirement in Tenn. Code Ann. §§ 47-3-104(1)(b), -106 when it was signed because its interest rate could not be computed "from the instrument itself without reference to any outside source." *See* Tenn. Code Ann. § 47-3-106 cmt. 1.  The note provided for interest "[a]t the Bank's 'Prime Rate' plus ___% per year."  It also defined the "Bank" as "Frederic B. Ingram" and "Prime Rate" as the "Bank's rate for loans to its most credit worthy customers for 90-day unsecured loans."  Thus, the note required Mr. Earthman to pay interest at whatever rate Mr. Ingram charged his most credit worthy customers for ninety-day unsecured loans.

This interest rate provision makes little sense on its face and certainly does not permit the calculation of interest from the face of the instrument itself.  Mr. Ingram was not in the business of making ninety-day unsecured loans, and it is not possible

---

[11]*See* Tenn. Code Ann. §§ 47-3-104(1)(b), -106, -107 (1979).

[12]*See* Tenn. Code Ann. § 47-3-104(1)(c).

[13]*See* Tenn. Code Ann. § 47-3-104(1)(d).

[14]*See* Act of May 27, 1981, ch. 511, §§ 2 & 3, 1981 Tenn. Pub. Acts 846.  The legislative debates clearly indicate that this bill was designed to address the uncertainty about whether notes with variable interest rate terms were negotiable instruments.

to determine from the face of the note what Mr. Ingram's "Prime Rate" might have been. Accordingly, the note was not for a sum certain and, therefore, was not negotiable.

The 1981 changes in the substance of Tenn. Code Ann. §§ 47-3-104(1)(b), -106(1) do not apply to Mr. Earthman's note. However, even if they did, they would not render the note negotiable. As amended, Tenn. Code Ann. § 47-3-104(1)(b)(ii) and Tenn. Code Ann. § 47-3-106(1)(f) permitted negotiable instruments to contain renegotiable or variable rates of interest and to require the payment of a "sum of money which is determinable by a formula as provided in the writing, whether or not such formula requires the use of extrinsic criteria." Other courts that have construed these provisions have held that they authorize the use of readily ascertainable formulae based on some objective or marketplace factor. *See Randolph v. Resolution Trust Corp.*, 995 F.2d 611, 614 (5th Cir. 1993); *Walters v. First Tenn. Bank*, 855 F.2d 267, 274-75 (6th Cir. 1988); *First City Fed. Sav. Bank v. Bhogaonker*, 715 F. Supp. 1216, 1219 (S.D.N.Y. 1989). Mr. Ingram's "Prime Rate" is not based on a readily ascertainable, objective marketplace standard. Thus, Mr. Earthman's October 14, 1980 note fails to meet the negotiability requirements in Tenn. Code Ann. § 47-3-104(1)(b)(ii) and Tenn. Code Ann. § 47-3-106(1)(f).

## C.

The conclusion that Mr. Earthman's note was not a negotiable instrument is entirely consistent with the conduct of the parties. Their transaction was not a commercial one, but rather a financial accommodation between friends. Mr. Earthman prepared the note, not with the intention or anticipation that it would enter the stream of commerce as a negotiable instrument, but rather as evidence of his agreement to repay Mr. Ingram's $1,700,000 loan. Thus, concluding that the note was not negotiable does not conflict with the parties' expectations.

Likewise, the conclusion that Mr. Earthman's note was not negotiable does not materially alter or undermine the parties' legal rights or responsibilities. An instrument may still be a note even if it is not negotiable. *See Cummings v. Freeman*, 21 Tenn. (2 Hum.) 143, 145 (1840) (holding that negotiability is not an essential element of a note); *see also Gibson v. Harl*, 857 S.W.2d 260, 267 (Mo. Ct. App. 1993). Thus, the negotiability of an instrument is irrelevant in an action between the

original parties to the note based either on the note itself or the underlying obligation. *See Clements v. Lindsay*, 320 So. 2d 608, 609 (La. Ct. App. 1975); *Terry v. Superintendent of Educ.*, 52 So. 2d 13, 14 (Miss. 1951); *Mauricio v. Mendez*, 723 S.W.2d 296, 298 (Tex. Ct. App. 1987); Joseph Story, *Commentaries on the Law of Promissory Notes* § 41 (Boston, Little, Brown, and Co. 1868).

## III.

We now turn to Mr. Earthman's assertion that he was entitled to a directed verdict because Mr. Ingram failed to produce the original note at trial. He insists that the evidence of the creation of Mr. Ingram's trusts and the possession of the note by one of Mr. Ingram's trustees requires the conclusion that Mr. Ingram was not the holder or owner of the note after 1982. We have determined that the evidence does not weigh so heavily in Mr. Earthman's favor that it requires the finder-of-fact to conclude that Mr. Ingram assigned the note to another and, therefore, was no longer the holder or owner of the note.

## A.

An appeal from the denial of a directed verdict involves a question of law concerning whether the evidence is sufficient to create an issue for the jury to decide. *See Underwood v. Waterslides of Mid-America, Inc.*, 823 S.W.2d 171, 176 (Tenn. Ct. App. 1991); *Norman v. Liberty Life Assurance Co.*, 556 S.W.2d 772, 773 (Tenn. Ct. App. 1977). The reviewing court does not weigh the evidence, *see Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *Benton v. Snyder*, 825 S.W.2d 409, 413 (Tenn. 1992), or evaluate the credibility of the witnesses. *See Benson v. Tennessee Valley Elec. Coop.*, 868 S.W.2d 630, 638-39 (Tenn. Ct. App. 1993). Instead, it reviews the evidence most favorably to the party against whom the motion is made, gives that party the benefit of all reasonable inferences from the evidence, and also disregards all evidence contrary to that party's position. *See Eaton v. McClain*, 891 S.W.2d 587, 590 (Tenn. 1994); *Gann v. International Harvester Co.*, 712 S.W.2d 100, 105 (Tenn. 1986).

Directed verdicts are appropriate only when reasonable minds can reach one conclusion. *See Williams v. Brown*, 860 S.W.2d 854, 857 (Tenn. 1993); *Crosslin v. Alsup*, 594 S.W.2d 379, 380 (Tenn. 1980). A case should go to the jury, even if the

facts are undisputed, when reasonable persons could draw conflicting conclusions from the facts. *See Gulf, M. & O.R.R. v. Underwood*, 182 Tenn. 467, 474, 187 S.W.2d 777, 779 (1945); *Pettus v. Hurst*, 882 S.W.2d 783, 788 (Tenn. Ct. App. 1993). These conclusion, however, must be based on more than speculation, conjecture, and guesswork. *See Daniels v. White Consol. Indus., Inc.*, 692 S.W.2d 422, 425 (Tenn. Ct. App. 1985).

## B.

Despite his assertion that he had owned nothing except his clothes since 1982, Mr. Ingram did not surrender all his assets directly into the Liechtenstein trusts. Florian von Meiss, the Swiss lawyer serving as one the trustees, held several assets for Mr. Ingram until he could decide what to do with them. One of the assets being held by Mr. von Meiss was Mr. Earthman's note.

Mr. Ingram turned over the note to Mr. von Meiss on January 26, 1982 in Zurich. On that date, Mr. Ingram executed a written assignment prepared by Mr. von Meiss but purposely did not fill in the name of the assignee. The written assignment was not affixed to the note in any way. He then gave the original note and the assignment form to Mr. von Meiss. Both the assignment and the original note have been in Mr. von Meiss's hands ever since, awaiting Mr. Ingram's directions.

Mr. Earthman was generally aware in late 1981 that Mr. Ingram was placing all his assets in trust in order to avoid paying taxes in the United States. He was not necessarily aware of the location or status of his note until December 1992. During their meeting in the Dallas airport, Mr. Ingram told Mr. Earthman that the note was in Zurich and invited him to pick up the note in Zurich in return for his signature on a statement implicating Commerce Union Bank in the handling of Mr. Ingram's loans at the United American Bank and the Banque d'l Union Europeene. In light of this conversation, Mr. Earthman knew more than sixteen months before Mr. Ingram filed suit that the note was in Zurich.

Mr. Ingram alleged in his complaint that Mr. Earthman executed the $1,700,000 promissory note on October 14, 1980 and appended a copy of the note to

his complaint.[15] He also alleged that Mr. Earthman had "refused to repay any of the money he borrowed or received from Ingram," that he had "not recovered any of the funds he advanced to Earthman" and that Mr. Earthman did not dispute that he had not repaid the funds he had borrowed. Based on these allegations, Mr. Ingram asserted in Count I of his complaint, called "Breach of Contract/Promissory Note," that "Earthman has agreed in writing and orally to repay Ingram for all of his loans, advances and payments. Earthman has breached his obligations under the Note and his other obligations."

Mr. Earthman admitted in his answer that he signed the note and that the copy of the note appended to Mr. Ingram's complaint was a true and accurate copy of the note he executed on October 14, 1980. He also admitted that he had "not repaid the note to Plaintiff of $1,700,000 with interest or any amount to repay the Cayman Islands debt or attorneys' fees and expenses." With specific reference to Mr. Ingram's "Breach of Contract/Promissory Note" claim, Mr. Earthman denied that he renewed his promise to pay Mr. Ingram on many occasions and asserted affirmative defenses based on laches and the six-year statute of limitations.

In November 1994, in response to Mr. Earthman's motion for summary judgment, the trial court dismissed four of Mr. Ingram's five claims against Mr. Earthman after concluding that "[t]he facts Ingram alleges do not state a cause of action for anything other than on the note." Thus, after November 1994, the parties prepared for trial with the understanding that Mr. Ingram's claim against Mr. Earthman was essentially a suit based on Mr. Earthman's note.

Mr. Ingram was deposed on April 20, 1995. In response to questions by Mr. Earthman's lawyer, he described the creation of the Liechtenstein trusts and explained how he had transferred assets worth between $100,000,000 and $150,000,000 to these trusts. While he claimed that he owned no assets except his clothes after 1982, Mr. Ingram also explained that Mr. von Meiss was holding the original note and the blank assignment form until he decided what to do with the

---

[15]Paragraph 14 of the complaint states:

> On or about October 14, 1980, Earthman signed an eighteen month promissory note on a Commerce Union promissory note form promising to pay Ingram $1,700,000 together with interest and delivered that note to Ingram's secretary (the "Note"). A copy of the Note, which is due, owing and unpaid to the present day, is attached hereto as Exhibit A.

note. Mr. Ingram also provided Mr. Earthman's lawyer with a copy of the note and the January 26, 1982 assignment.

Both parties tried the case on the basis that Mr. Ingram's claim against Mr. Earthman was premised on the October 14, 1980 note. Mr. Ingram's lawyer displayed an enlarged copy of the note during his opening argument. Mr. Earthman's lawyer argued that Mr. Ingram's claim was based on the note and admitted that Mr. Earthman had not paid the note when it came due in April 1982. He told the jury that Mr. Earthman had not paid the note because Mr. Ingram had gratuitously promised to forgive Mr. Earthman's $1,700,000 debt and that Mr. Ingram lost his right to insist on payment of the note after the statute of limitations ran in April 1988. Mr. Earthman's lawyer did not argue to the jury that Mr. Ingram was not entitled to recover on the note because he was no longer the owner or holder of the note.

Mr. Ingram was the first witness during his case-in-chief. Early on the second day of trial, his lawyer sought to introduce a copy of Mr. Earthman's note into evidence by asking him to identify the copy. One of the lawyers representing Mr. Earthman pointed out that Mr. Ingram was seeking to introduce a copy of the note rather than the original. After Mr. Ingram testified that the copy sought to be introduced was a true and accurate copy of the original note, the trial court admitted the copy into evidence without objection from Mr. Earthman.

On the third day of trial, while being cross-examined about the discussion surrounding Mr. Ingram's gift of the note to Mr. Earthman, one of Mr. Ingram's New Orleans lawyers testified that "the note obviously would not be in Ingram's possession if it had been given away." This statement prompted the trial court, with the agreement of the lawyers for both parties, to give the jury a detailed instruction concerning the legal significance of a holder of a note giving the original note back to the maker.[16] Before Mr. Ingram closed his case-in-chief, he introduced portions of Mr. Earthman's deposition in which Mr. Earthman admitted (1) that he borrowed $1,700,000 from Mr. Ingram in 1980, (2) that he prepared and signed a promissory note for the $1,700,000 loan on October 14, 1980, (3) that he did not pay the note

---

[16]During this instruction, the trial court illustrated its point by explaining: "If you borrow money from the bank and sign the note and you go back in and say to the bank, give me my note back, and they give you the note, they can't enforce the note anymore because they don't have it."

when it came due in April 1982, (4) that he has never repaid the principal and interest, and (5) that Mr. Ingram never gave him the original note.

Mr. Earthman moved for a directed verdict at the close of Mr. Ingram's case-in-chief on two grounds. First, he asserted that Mr. Ingram had presented no material evidence on which a verdict for the plaintiff could stand. Second, he asserted that Mr. Ingram had failed to present evidence upon which the jury could find that his claim was not barred by the statute of limitations. He did not elaborate on his first ground and never asserted specifically that Mr. Ingram had failed to prove that he was the holder or owner of the note. The trial court responded to the motion as follows:

> in this case, Mr. Earthman has admitted execution of the note and . . . that he hasn't paid it. Then the burden shifts to him to prove a defense. All the holder of the note has to do is prove the signature and nonpayment.
>
> The defense that Mr. Earthman offers, and the only defense, is the statute of limitations; I mean, the only one for the jury to decide.

Thereafter, the trial court overruled Mr. Earthman's motion for directed verdict, stating that "there is ample evidence in the record so far to support a jury conclusion that Mr. Earthman is estopped from raising the statute of limitations or Mr. Ingram's excused for [sic] filing the case within the time period, however you want to put it."

During his testimony on the fifth day of trial, Mr. Earthman admitted that he borrowed $1,700,000 from Mr. Ingram in October 1980 and that he had never repaid the principal or interest. He also admitted that he prepared and signed the note, that he sent the note to Mr. Ingram's secretary in New Orleans, and that Mr. Ingram had never given him the original note despite their discussions.

On the eighth day of trial as Mr. Earthman's case came to a close, Mr. Earthman's lawyer sought to introduce the portions of Mr. Ingram's deposition containing his testimony about the transfer of his assets to the Liechtenstein trusts. For the first time, Mr. Earthman's lawyer argued that this testimony was relevant because it "shows that he [Mr. Ingram] is not the holder of this note and that he transferred the note to the trust, and he is not the holder and he has no right to bring this action." In response to this new argument, the trial court ruled "that the defense that Mr. Ingram is not a holder of the note sued upon is an affirmative defense and must be pled and is not plead and, therefore, it is not relevant in this case."

Despite its ruling, the trial court permitted Mr. Ingram's lawyer to recall Mr. Ingram to the stand to testify that he owned the note. Following Mr. Ingram's testimony, the trial court permitted Mr. Earthman's lawyer to read to the jury portions of Mr. Ingram's April 29, 1995 deposition in which he stated that he owned no assets after 1982 except his clothes and that Mr. von Meiss had kept the note since 1982. The trial court also permitted Mr. Ingram's lawyer to read additional portions of the deposition in which Mr. Ingram explained that Mr. von Meiss was holding the note for him until he decided what to do with it.

At the close of all the proof, on the ninth and last day of trial, Mr. Earthman's lawyer moved for a directed verdict on the grounds that Mr. Ingram had failed to prove that he was the holder of the note and that the statute of limitations barred Mr. Ingram's claim. Mr. Ingram's lawyer responded:

> This issue about the ownership of the note came up at the last two days of the trial and doesn't have anything to do with any issue in this trial. What it is is a blank assignment, which in the course of discovery I provided to Mr. Davis; it is a common way that something held in safekeeping in another country so that in the event Mr. Ingram wants to transfer it to somebody, he can tell Mr. von Meiss to put the name in there.

> It is a blank assignment. Mr. Ingram is the owner of the note and has been the owner of the note. It has been held, as he testified to in his deposition, for safekeeping by Mr. von Meiss with his other papers in Switzerland.

>        \*        \*        \*

> We could have the note here probably on Tuesday if it's needed. We have been prejudiced by his delay in raising this action because all we have to do is call Mr. Florian von Meiss in Switzerland and he will send it by courier to the United States, and we can't have it here before Tuesday.

Following these arguments, the trial court overruled Mr. Earthman's motion for directed verdict by stating: "That was raised for the first time on the eighth day of a nine-day trial and as I previously held, I believe that's an affirmative defense. It must be pled and it is not pled, and that's not an issue in this case, at least today, and so I overrule the motion based on that."

During its instructions, the trial court explained to the jury that Mr. Ingram's claim against Mr. Earthman was based on Mr. Earthman's note. The trial court also

pointed out that Mr. Earthman had admitted that he signed the note and that he had not repaid it. The trial court also explained that Mr. Earthman's defense was based on the statute of limitations and that Mr. Ingram had the burden of proving that Mr. Earthman was estopped to assert this defense. The trial court summarized the jury's responsibility as follows: "[T]here are two questions you must decide. First, has Ingram established that Earthman is estopped from relying on the statute of limitation as a defense . . . If, and only if, you decide that issue in favor of Ingram, you should answer the second question which is, what is the amount Earthman owes Ingram on the note."

The jury returned a judgment for Mr. Ingram, and on June 19, 1995, the trial court entered a judgment and final order awarding Mr. Ingram $5,667,122.84 plus $400,000 in legal expenses. Mr. Earthman filed post-trial motions on July 17, 1995 asserting, among other issues, that the trial court should have directed a verdict on the statute of limitations and holder issues. Mr. Ingram filed a response to these motions on August 28, 1995, and also submitted the original note. The trial court denied Mr. Earthman's post-trial motions on September 8, 1995 and approximately one month later denied Mr. Earthman's motion to strike the original note from the record.

## C.

Mr. Earthman insists that he was entitled to a directed verdict because Mr. Ingram failed to prove that he was the holder or owner of the note by producing the original note at trial.[17] While producing the original note at trial is the most efficient and conclusive way for a party to prove that it is the holder or owner of a note, it is not the only way. Under the facts of this case, Mr. Ingram introduced other sufficient competent evidence from which the jury could have concluded that he was the holder and owner of Mr. Earthman's note.

---

[17]Producing a note at trial differs from the plaintiff's traditional obligation to make profert of the note in its complaint. Making profert amounted to an averment by the plaintiff that the original instrument on which its suit was based was in court or in the possession of the pleader, ready to be produced or shown to the adverse party if desired. *See* Sam B. Gilreath & Bobby R. Aderholt, *Caruthers' History of a Lawsuit* § 128, at 143 (8th ed. 1963). Profert was not required at common law in a suit on a note, *see Gardner v. Henry*, 45 Tenn. (5 Cold.) 458, 459 (1868), but had been required by statute in Tennessee ever since 1819. *See* Tenn. Code Ann. § 20-706 (1955). The statutory obligation to make profert was repealed in 1972 following the adoption of the Tennessee Rules of Civil Procedure, s*ee* Act of March 21, 1972, ch. 565, § 1(6), 1972 Tenn. Pub. Acts. 382, 384, and was replaced by Tenn. R. Civ. P. 10.03 which permits attaching a copy of the written instrument sued on rather than the original. Profert was never required in suits on the debt underlying the note. *See Gardner v. Henry*, 45 Tenn. (5 Cold.) at 459.

Mr. Ingram's claim against Mr. Earthman is based only on the note.[18] In a suit on a note, the holder makes out a prima facie case by producing the note signed by the maker and by showing that there is a balance due on the note. *See Crossland Fed. Sav. Bank v. A. Suna & Co.*, 935 F. Supp. 184, 191 (E.D.N.Y. 1996); *Smith v. Weindrop*, 833 P.2d 856, 857 (Colo. Ct. App. 1992); *Misemer v. Freda's Restaurant, Inc.*, 961 S.W.2d 120, 121 (Mo. Ct. App. 1998); *L. Harvey & Son, Co. v. Jarman*, 333 S.E.2d 47, 52-53 (N.C. App. 1985); *Judarl, L.L.C. v. Cycletech, Inc.*, 667 N.Y.S.2d 451, 452 (App. Div. 1998).

Producing the original note is not, however, the only way to establish a prima facie case. The holder may also produce a copy of the note along with evidence that (1) the plaintiff is the holder or owner of the note, (2) that the maker signed the note, (3) that the note is in default and there is a balance due on the note, (4) that the copy produced at trial is a true and accurate copy of the note sued on, and (5) that the holder has not assigned, pledged, or transferred the note to another. *See Resolution Trust Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995); *FDIC v. McCrary*, 977

---

[18]The maker of a note, as a general matter, gives a note as payment for an underlying obligation. *See* Hagedorn, ¶ 11.06. The underlying obligation, usually itself a contract, is the original obligation between the parties that led to the issuance of the note. The issuance of a note does not discharge the underlying obligation, but rather suspends it. *See* 2 White & Summers, § 16-14.

Refusal to pay a note when due results not only in a breach of the terms of the note but also a breach of the underlying obligation. When a maker dishonors a note, the holder may seek judicial relief on the note itself, the underlying obligation, or both in the alternative. *See First State Bank & Trust Co. v. McIver*, 681 F. Supp. 1562, 1564 (M.D. Ga. 1988); *Reifeiss v. Barnes*, 192 S.W.2d 427, 430 (St. L. Ct. App. 1946); *Rubbelke v. Strecker*, 765 P.2d 314, 316 (Wash. Ct. App. 1988). Thus, as between the original parties, the payee may sue the maker on the note or may waive the cause of action on the note and sue on the underlying obligation. *See Alsobrook v. Hathaway*, 35 Tenn. (3 Sneed) 454, 457 (1856); *Cook v. Beech*, 29 Tenn. (10 Hum.) 412, 414 (1849); *see also Affiliated Acceptance Corp. v.* Boggs, 917 S.W.2d 652, 656 (Mo. Ct. App. 1996); *Mansion Carpet, Inc. v. Marinoff*, 265 N.Y.S.2d 298, 299 (App. Div. 1965); *Doyle v. Chladek*, 401 P.2d 18, 25 (Ore. 1965).

The suit on the note is preferable. *See* 3 Joseph F. Randolf, *A Treatise on the Law of Commercial Paper* § 1673 (St. Paul, West 2d ed. 1899). However, if the action is brought on the underlying obligation, the plaintiff need not produce the note. *See Gardner v. Henry*, 45 Tenn. (5 Cold.) at 459 (holding that profert was not necessary); *see also United Postal Savs. Ass'n v. Norbob Enters., Inc.*, 792 S.W.2d 898, 901 (Mo. Ct. App. 1990). In this circumstance, the note is simply evidence of the maker's indebtedness to the payee. *See Owen v. George Cole Motor Co.*, 155 Tenn. 250, 252, 292 S.W. 1, 2 (1927); *see also Price v. Mize*, 628 P.2d 705, 706 (Okla. 1981); *Mortgage Assocs., Inc. v. Monona Shores, Inc.*, 177 N.W.2d 340, 347 (Wis. 1970).

The wording of Mr. Ingram's complaint is broad enough to include a claim based on the October 14, 1980 note and a claim based on the underlying $1,700,000 loan. Thus, while Mr. Ingram could have elected to pursue Mr. Earthman on the underlying loan, he did not. The entire course of the proceedings following the trial court's November 1994 order dismissing all of Mr. Ingram's claims against Mr. Earthman except the claim based on the note demonstrates that Mr. Ingram elected to pursue the claim based on Mr. Earthman's October 14, 1980 note.

F.2d 192, 194 (5th Cir. 1992); *United States v. Golden Elevator, Inc.,* 868 F. Supp. 1063, 1065 (C.D. Ill. 1994); *Sonne v. FDIC*, 881 S.W.2d 789, 794 (Tex. Ct. App. 1994); *Edlund v. Bounds*, 842 S.W.2d 719, 724 (Tex. Ct. App. 1992). The holder may supply one or more of these elements of proof using the maker's admissions in its answer or during discovery or at trial. *See Vetter v. FDIC*, 426 So. 2d 444, 446 (Ala. Civ. App. 1983); *McLemore v. Southwest Ga. Farm Credit, ACA*, 495 S.E.2d 335, 337 (Ga. Ct. App. 1998); *Good v. Good*, 324 S.E.2d 43, 45 (N.C. Ct. App. 1985).

The purpose of the presentment rule is to facilitate proof that the plaintiff is the holder of the note, *see James Talcott, Inc. v. Allahabad Bank, Ltd.*, 444 F.2d 451, 458 (5th Cir. 1971); *Union Sav. Bank v. Cassing*, 691 S.W.2d 513, 515 (Mo. Ct. App. 1985), and to avoid the risk that the maker might be required to pay the same note twice. *See McKirgan v. American Hosp. Supply Corp.*, 375 A.2d 591, 593 (Md. Ct. Spec. App. 1977); *Prime Fin. Group, Inc. v. Smith*, 623 A.2d 757, 759 (N.H. 1993); *Haupt v. Coldwell*, 500 S.W.2d 563, 565 (Tex. Civ. App. 1973). In disputes between the original parties, the presentment rule is not as important when the note is not negotiable because the holder is not a holder in due course and thus, the maker can assert the defense of payment under Tenn. R. Civ. P. 8.05 in a subsequent suit on the same note.

### D.

It is the better practice in a suit on a note, negotiable or not, for the plaintiff to produce the original note at trial and introduce it into evidence. Doing so effectively forestalls any issue concerning whether the plaintiff is the holder or owner of the note. Had Mr. Ingram produced Mr. Earthman's original note, no dispute would have been precipitated later concerning his status as the holder or owner of the note. However, Mr. Ingram did not produce the original note, and thus we must now determine whether the record contains sufficient evidence to defeat Mr. Earthman's motion for directed verdict at the close of all the proof.

Mr. Ingram's testimony and Mr. Earthman's admissions establish conclusively (1) that Mr. Earthman prepared and executed the note, (2) that Mr. Earthman delivered the note to Mr. Ingram, (3) that Mr. Earthman did not pay the note when it came due, (4) that Mr. Earthman has never repaid Mr. Ingram the principal and interest due on the note, and (5) that the copy of the note Mr. Ingram produced at trial

was a true and accurate copy of the original note. The only remaining essential element of Mr. Ingram's case concerns whether Mr. Ingram is the holder or owner of the note or whether he assigned or transferred the note to another.

Mr. Earthman would be entitled to a directed verdict only if the evidence permitted the jury to draw only one reasonable conclusion – that Mr. Ingram was not the holder or owner of the note because he assigned it to Mr. von Meiss in 1982. The evidence is simply not sufficiently one-sided to support this conclusion. To the contrary, the evidence demonstrates rather convincingly that Mr. von Meiss was holding the original note as Mr. Ingram's agent while Mr. Ingram decided what to do with the note. Accordingly, rather than establishing that Mr. Ingram was not the holder or owner of the note, the evidence points toward a contrary result. Therefore, the trial court properly denied Mr. Earthman's motion for directed verdict at the close of all the proof based on the claim that Mr. Ingram had not proved that he was the holder or owner of the note.

## IV.

Mr. Earthman also asserts that he was entitled to a directed verdict on his statute of limitations defense. He argues that the only conclusions a reasonable fact-finder could draw from the evidence were either that he did not induce Mr. Ingram to delay filing suit on the note by promising to pay the note or that he did not revive the note after the statute of limitations ran by expressly promising to pay it or by acknowledging the debt and expressing a willingness to pay it. We have determined that the evidence presents a jury question concerning whether Mr. Earthman was estopped to rely on the statute of limitations and whether Mr. Earthman, by his statements and conduct, revived his obligation under the note after the statute of limitations ran.

### A.

A defense based on the statute of limitations is an affirmative defense. *See* Tenn. R. Civ. P. 8.03. The defendant asserting it has the burden of establishing all of its elements. *See Carr v. Borchers*, 815 S.W.2d 528, 532 (Tenn. Ct. App. 1991);

*Stockburger v. Ray*, 488 S.W.2d 378, 382 (Tenn. Ct. App. 1972); *Jones v. Hamilton County*, 56 Tenn. App. 240, 247, 405 S.W.2d 775, 779 (1965). However, once the defendant establishes the defense, the burden shifts to the plaintiff to establish one or more of the recognized exceptions to the defense. *See Jones v. Coal Creek Mining & Mfg. Co.*, 133 Tenn. 159, 169, 180 S.W. 179, 182 (1915); *Smith v. Southeastern Properties, Ltd.*, 776 S.W.2d 106, 109 (Tenn. Ct. App. 1989).

Mr. Earthman did not repay his note to Mr. Earthman when it came due on April 14, 1982. Accordingly, Tenn. Code Ann. § 28-3-109(a)(3) (1980) required Mr. Ingram to file suit against Mr. Earthman based on the note within six years or by no later than April 14, 1988. The parties agreed that Mr. Ingram did not file suit against Mr. Earthman until March 24, 1992 – well after the six-year limitations period had expired. Thus, Mr. Earthman established a prima facie defense based on the running of the applicable statute of limitations, and the burden shifted back to Mr. Ingram to establish one or more of the exceptions to a statute of limitations defense. Mr. Ingram relied on two exceptions. First, he asserted that Mr. Earthman was estopped to assert a statute of limitations defense. Second, he asserted that Mr. Earthman revived his obligation under the note after the limitation period had expired.

In its jury instructions concerning the parties' respective burdens with regard to the statute of limitations defense, the trial court informed the jury that Mr. Earthman had established that Mr. Ingram did not file his suit until after the six-year limitations period expired. Accordingly, the trial court instructed the jury that Mr. Ingram had the burden of establishing either that Mr. Earthman was estopped to assert the statute of limitations defense or that Mr. Earthman had revived his obligation under the note after the statute of limitations had run. The trial court also included a question on the jury form asking: "Has Ingram proven facts which estop Earthman from relying upon the statute of limitation as a defense or which excuse Ingram from failing to file suit within the six year limitation period." The jury answered "Yes" to this question. Mr. Earthman now argues that this question should have been decided in his favor as a matter of law.

**B.**

Estoppel and revival are complementary responses to a statute of limitations defense. A defendant will be estopped to assert a statute of limitations defense when

it induces a plaintiff to refrain from filing suit during the applicable limitations period. *See Dukes v. Montgomery County Nursing Home*, 639 S.W.2d 910, 912 (Tenn. 1982); *American Mut. Liability Ins. Co. v. Baxter*, 210 Tenn. 242, 247, 357 S.W.2d 825, 827 (1962). Statements or conduct that support an estoppel claim include representations, made prior to the expiration of the limitations period, that the defendant either would not assert a statute of limitations defense or that the dispute would be amicably resolved without filing suit. *See Sparks v. Metropolitan Gov't*, 771 S.W.2d 430, 433 (Tenn. Ct. App. 1989); *Whitlow v. Hardin County*, 13 Tenn. App. 347, 359 (1930). Persons who successfully establish the estoppel exception to a statute of limitations defense must file suit within a reasonable time after becoming aware that the debtor will not pay the debt. *See Neaterour v. Holt*, 544 N.E.2d 846, 852 (Ill. App. Ct. 1989); *Cacdac v. Hiland*, 561 N.E.2d 758, 758 (Ind. 1990); *Reifschneider v. Nebraska Methodist Hosp.*, 447 N.W.2d 622, 626 (Neb. 1989); *Leonard v. Eskew*, 731 S.W.2d 124, 129 (Tex. Ct. App. 1987).

Similarly, a defendant may revive a plaintiff's remedy that had been barred by the running of a statute of limitations[19] either by expressly promising to pay the debt or by acknowledging the debt and expressing a willingness to pay it. *See Hall v. Skidmore*, 180 Tenn. 23, 27, 171 S.W.2d 274, 275 (1943), *overruled on other grounds*, *Graves v. Sawyer*, 588 S.W.2d 542, 544 (Tenn. 1979); *Warren v. Cleveland*, 111 Tenn. 174, 177, 76 S.W. 910, 910 (1903); *Crowder v. Nichol*, 17 Tenn. (9 Yer.) 453, 454 (1836). The defendant must make the promise or give the acknowledgment directly to the plaintiff or someone standing in such a close relationship with the plaintiff that it is reasonable to infer that the defendant's statements will reach the plaintiff. *See Jones v. Miller*, 173 Tenn. 360, 363, 117 S.W.2d 745, 746 (1938); *Roller v. Bachman*, 73 Tenn. 153, 157 (1880).

The expression of willingness to pay the debt that must accompany the acknowledgment of the debt may be implied from the defendant's words or acts but,

---

[19]A statute of limitations bars the remedy only; it does not undermine the substance of the plaintiff's claim or cause of action. *See Woodlie v. Towles*, 68 Tenn. 592, 593-94 (1877); *Wyatt v. A-Best Prods. Co.*, 924 S.W.2d 98, 102 (Tenn. Ct. App. 1995); *Rankhorn v. Sealtest Foods*, 63 Tenn. App. 714, 723, 479 S.W.2d 649, 652 (1971). Some older decisions hold that the revival exception predicates liability on the original debt that has been revived, *see e.g., Jordan v. Jordan*, 85 Tenn. 561, 565 (1887); *Woodlie v. Towles*, 68 Tenn. at 594; *Williamson Bros. v. Daniel*, 21 Tenn. App. 346, 351, 110 S.W.2d 1028, 1031 (1937); while other older decisions predicated liability on the new promise. *See e.g., Belote's Executors v. Wynne*, 15 Tenn. (7 Yer.) 534, 543-44 (1835). Other courts have observed that whether the remedy for the old cause of action is revived or a new cause of action based on the old consideration is created are "questions of some metaphysical nicety, but [are] of no practical importance." *Hannah v. Hawkins*, 73 Tenn. 240, 242 (1880).

in whatever form, the words or acts must amount to a recognition of the continuing obligation. *See Hall v. Skidmore*, 180 Tenn. at 27, 171 S.W.2d at 275; *C.A. Hobbs, Jr., Inc. v. Brainard*, 919 S.W.2d 337, 338 (Tenn. Ct. App. 1995). Persons who successfully establish the revival exception to a statute of limitations defense must file suit with the applicable limitations period measured from when the conduct constituting the revival occurred. *See Graves v. Sawyer*, 588 S.W.2d 542, 544 (Tenn. 1979).

## C.

The record is replete with evidence of numerous instances occurring between April 1982 and December 1992 in which Mr. Earthman acknowledged his debt to Mr. Ingram and either stated or indicated a willingness to repay the debt or to enter into an amicable arrangement to discharge the debt. Mr. Ingram testified that Mr. Earthman told him during a conversation in April 1982 before Mr. Earthman's note came due that he was unable to pay the note and that he would ask United American Bank to renew the loan in Mr. Ingram's name. Similarly, in May 1983, Mr. Earthman acknowledged his continuing obligation to repay Mr. Ingram when he asked Mr. Ingram to pay Banque d'l Union Europeene $2,729,675.95 in order to prevent Commerce Union Bank from being called upon to repurchase Mr. Ingram's note.

In April and May 1987, Messrs. Earthman and Ingram discussed the possibility that Mr. Ingram might forgive Mr. Earthman's indebtedness. Mr. Earthman sent Mr. Ingram three proposals that in essence involved canceling the debt in order to discharge Mr. Earthman's compensation claims involving two of Mr. Ingram's companies. When Mr. Ingram categorically rejected these proposals, Mr. Earthman acknowledged his continuing obligation to repay the loan, and the two men discussed how Mr. Earthman could earn sufficient income from other business ventures to enable him to repay Mr. Ingram.

The first venture Messrs. Ingram and Earthman discussed involved the sale of Arcata Corporation to Japanese investors which, if accomplished, would result in a sizeable commission for Mr. Earthman. In April 1988, just as the statute of limitations was about to run on the note, Mr. Earthman told Mr. Ingram that he was still unable to repay the debt but that he hoped to be able to do so from the anticipated commission from the Arcata sale. Later, in September 1988 during a trip to Tokyo,

Mr. Earthman and Mr. Ingram agreed that any commission earned would be used to repay Mr. Earthman's debt to Mr. Ingram before Mr. Earthman received anything.

In April 1991 after the Arcata transaction fell through, Mr. Earthman offered to discharge his debt to Mr. Ingram by providing Mr. Ingram a 40% interest in a venture to bottle and market springwater from Mr. Earthman's Beersheba Springs farm. The venture never got off the ground after Coca-Cola Corporation expressed no interest in it. Mr. Ingram did not agree to accept Mr. Earthman's offer when he sensed that Mr. Earthman was losing interest in the project.

The final discussion between Messrs. Earthman and Ingram concerning Mr. Earthman's debt occurred in December 1992 when the two men met in the Dallas airport. According to Mr. Ingram, Mr. Earthman acknowledged the debt and indicated that he remained willing but unable to pay it. He also told Mr. Ingram that he would assist Mr. Ingram in his efforts to induce Commerce Union Bank to pay a portion of the debt because of the way it had managed Mr. Ingram's United American Bank and Banque d'l Union Europeene loans. Mr. Ingram filed suit against Mr. Earthman in March 1994.

Statute of limitations defenses can be factually troublesome. *See Hibner v. St. Paul Mercury Ins. Co.*, 619 S.W.2d 109, 110 (Tenn. 1981). Accordingly, the jury should normally decide whether a defendant should be prevented from asserting a statute of limitations defense. *See Apperson v. Pattison*, 79 Tenn. 484, 486 (1883); *Frazor v. Osborne*, 57 Tenn. App. 10, 20, 414 S.W.2d 118, 123 (1966), *overruled on other grounds*, *Stanbury v. Bacardi*, 953 S.W.2d 671, 675 (Tenn. 1997). The question should be withdrawn from the jury only when the trial court determines that reasonable persons could reach only one conclusion based on the evidence. Our review of the evidence convinces us that a jury question existed concerning whether Mr. Earthman induced Mr. Ingram to delay filing suit by continuing to acknowledge his debt and by expressing his willingness but inability to repay it.

## V.

Mr. Earthman also takes issue with the jury instructions. Specifically, he asserts that the trial court's instructions contain two misstatements of the law and that the trial court erroneously declined to give four of his requested instructions. We

have determined that the trial court did not commit reversible error by denying Mr. Earthman's requested instructions and that the trial court's instructions, taken as a whole, fairly defined the issues in the case and did not mislead the jury.

## A.

Juries have the exclusive duty to decide all the disputed factual issues submitted to them, *see McCormic v. Smith*, 668 S.W.2d 304, 306 (Tenn. Ct. App. 1984); *Finks v. Gillum*, 38 Tenn. App. 304, 311-12, 273 S.W.2d 722, 726-27 (1954), based on the law as explained by the trial court. *See McCorry v. King's Heirs*, 22 Tenn. (3 Hum.) 267, 277-78 (1842); *Ladd v. Honda Motor Co.*, 939 S.W.2d 83, 93 (Tenn. Ct. App. 1996). Thus, the trial court's instructions are the jury's sole source of the legal principles used to guide their deliberations. *See State ex rel. Myers v. Brown*, 209 Tenn. 141, 148-49, 351 S.W.2d 385, 388 (1961); *Grissom v. Metropolitan Gov't*, 817 S.W.2d 679, 685 (Tenn. Ct. App. 1991).

Trial courts have a duty to give substantially accurate instructions with regard to every fact and theory raised by the pleadings and supported by the proof. *See Street v. Calvert*, 541 S.W.2d 576, 584 (Tenn. 1976); *Souter v. Cracker Barrel Old Country Store, Inc.*, 895 S.W.2d 681, 684 (Tenn. Ct. App. 1994); *Tuggle v. Raymond Corp.*, 868 S.W.2d 621, 626 (Tenn. Ct. App. 1992). These instructions should be couched in plain terms easily understood by lay persons. *See Betty v. Metropolitan Gov't*, 835 S.W.2d 1, 10 (Tenn. Ct. App. 1992); *Martin v. Castner-Knott Dry Goods Co.*, 27 Tenn. App. 421, 431, 181 S.W.2d 638, 642 (1944).

Instructions should not contain inaccurate or inapplicable statements of legal principles that might tend to confuse the jury. *See Lantroop v. Moreland*, 849 S.W.2d 793, 798 (Tenn. Ct. App. 1992). However, instructions are not expected to be perfect. *In re Estate of Elam*, 738 S.W.2d 169, 174 (Tenn. 1987); *Benson v. Tennessee Valley Elec. Coop.*, 868 S.W.2d 630, 642-43 (Tenn. Ct. App. 1993). Our task on appeal is to review the instructions in their entirety, *see Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn. 1992); *Abbott v. American Honda Motor Co.*, 682 S.W.2d 206, 209 (Tenn. Ct. App. 1984), and to examine the challenged instruction in context to determine whether the instructions, as a whole, fairly and accurately embody the parties' theories. *See Gorman v. Earhart*, 876 S.W.2d 832, 836 (Tenn.

1994); *Mid-South Pavers, Inc. v. Whitaker*, 53 Tenn. App. 584, 593, 385 S.W.2d 284, 288 (1964).

Appellate courts review the entire charge just like a jury would, *see Memphis St. Ry. v. Wilson*, 108 Tenn. 618, 620, 69 S.W. 265, 265 (1902); *Abbott v. American Honda Motor Co.*, 682 S.W.2d at 209, rather than through the practiced eye of a judge or lawyer. *See Ladd v. Honda Motor Co.*, 939 S.W.2d at 94. We will not invalidate instructions as long as they fairly define the legal issues in the case and do not mislead the jury. *See Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d at 446; *Smith v. Parker*, 213 Tenn. 147, 156, 373 S.W.2d 205, 209 (1963); *Grissom v. Metropolitan Gov't*, 817 S.W.2d at 685. An erroneous instruction will not necessarily be considered reversible error if the trial court later explains or corrects the instruction or if the trial court adequately explains the issues in the case in other portions of its charge. *See In re Estate of Elam*, 738 S.W.2d at 174; *Smith v. Parker*, 213 Tenn. at 156, 373 S.W.2d at 209; *Ladd v. Honda Motor Co.*, 939 S.W.2d at 94, 103.

Trial courts should carefully consider requested instructions because the requesting parties are entitled to them (1) if they are supported by the evidence, (2) if they embody a theory relied on the party, (3) if they are correct statements of the law, and (4) if their substance is not already contained in other portions of the charge. *See Ladd v. Honda Motor Co.*, 939 S.W.2d at 103; *Spellmeyer v. Tennessee Farmers Mut. Ins. Co.*, 879 S.W.2d 843, 846 (Tenn. Ct. App. 1993). However, trial courts may decline to give a requested instruction (1) if it is not supported by the evidence, *see Payne v. Nashville, C. & St. L. Ry.*, 106 Tenn. 167, 173-74, 61 S.W. 86, 87 (1900); *Hartsell v. Fort Sanders Reg'l Med. Ctr.*, 905 S.W.2d 944, 949 (Tenn. Ct. App. 1995), (2) if its substance is already covered in the charge, *see Jack M. Bass & Co. v. Parker*, 208 Tenn. 38, 49, 343 S.W.2d 879, 884 (1961); *Tuggle v. Raymond Corp.*, 868 S.W.2d 621, 626 (Tenn. Ct. App. 1992), or (3) if it is incorrect or incomplete in any respect. *See Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d at 445; *Morton v. Martin Aviation Corp.*, 205 Tenn. 41, 53-54, 325 S.W.2d 524, 530 (1959).

**B.**

We turn first to Mr. Earthman's requested jury instructions. Of the four instructions denied by the trial court, two related to Mr. Ingram's status as a holder

or owner of Mr. Earthman's note, while the remaining two involved Mr. Earthman's statute of limitations defense.

### THE PROPOSED INSTRUCTIONS CONCERNING MR. INGRAM'S STATUS

Mr. Earthman requested instructions concerning the legal significance of an endorsement in blank and the consequences of transferring an instrument. Both instructions were based on the Uniform Commercial Code and were premised on Mr. Earthman's assertion that Mr. Ingram was no longer the owner or holder of the note because he had endorsed it in blank and had assigned it to Mr. von Meiss. While the trial court could properly have instructed the jury concerning the legal effect of transferring the note, it did not err by declining to give these instructions.

Requested instructions must be supported by the evidence and must be correct statements of the applicable law. These two instructions were not correct statements of the law because the Uniform Commercial Code did not govern Mr. Earthman's note. This note was not negotiable and, therefore, the rights and liabilities of the parties to the note must be found in the common law of bills and notes and in contract law.

The instructions were also not supported by the evidence. Mr. Ingram did not endorse the note in blank but rather executed a separate assignment form with the space for the name of the assignee left blank. The consequences of these acts differ because the assignment document was not so firmly affixed to the note as to become part thereof.[20] While non-negotiable notes may be transferred or assigned, *see Wolfe v. Tyler*, 48 Tenn. (1 Heisk.) 313, 316 (1870), whether an assignment has occurred depends on the intention and mutual assent of the assignor and the assignee. *See Patton v. Gleaves*, 206 Tenn. 541, 544, 334 S.W.2d 946, 948 (1960); *Hutsell v. Citizens' Nat'l Bank*, 166 Tenn. 598, 603, 64 S.W.2d 188, 190 (1933). The evidence does not establish that Mr. Ingram intended to assign all his interest in the note to Mr. von Meiss. At most, Mr. Ingram's unrebutted testimony, buttressed by the separate assignment form with the name of the assignee left blank, establishes that Mr. von

---

[20]Had Mr. Earthman's note been governed by the Uniform Commercial Code, the endorsement of the separate assignment document would not have amounted to an endorsement in blank of the note. *See* Tenn. Code Ann. § 47-3-202(2) (1979). Without an assignment in blank, the note could not have been negotiated by delivery alone. *See* Tenn. Code Ann. § 47-3-204(2) (1979).

Meiss was holding the note as Mr. Ingram's agent until Mr. Ingram decided what to do with the note.

## THE PROPOSED INSTRUCTIONS CONCERNING THE STATUTE OF LIMITATIONS DEFENSE

Mr. Earthman also requested two instructions regarding his statute of limitations defense. The first instruction would have informed the jury that

> In order to revive the debt, the burden of proof is on the Plaintiff, Ingram, to prove by a preponderance of the evidence that the Defendant, Earthman, made an unconditional promise to pay Ingram on or after March 24, 1988, or that on or after March 24, 1988, Earthman engaged in conduct that would induce an ordinarily prudent person not to file suit to collect the note.

The second requested instruction would have informed the jury that

> Statements or conduct, like payments on a note, reaffirming the debt, must be made to the holder of the note to toll the Statute of Limitations. If you find that Ingram was not holding the $1.7 million note, the statements or conduct by Earthman toward Ingram during such times as Ingram was not holding the $1.7 million note, will not bar or estop Earthman from relying upon the Statute of Limitations, as a defense to payment of the $1.7 million note.

The trial court properly declined to give Mr. Earthman's requested instruction that statements acknowledging a debt will not revive a cause of action on a note unless they are made directly to the holder. This proposed instruction is faulty for two reasons. First, it is legally incorrect because the statements of acknowledgment need not be made directly to the holder. They may also be made to persons whose relationship with the holder is so close that it is reasonable to presume that the statements found their way back to the holder. *See Jones v. Miller*, 173 Tenn. at 363, 117 S.W.2d at 746; *Roller v. Bachman*, 73 Tenn. at 157. Second, it is not supported by the evidence because the evidence is insufficient to create a jury question concerning Mr. Ingram's status as the owner or holder of the note.[21]

---

[21]Even if Mr. von Meiss, rather than Mr. Ingram, was considered the holder of the note, the relationship between Mr. von Meiss and Mr. Ingram supports an inference that any statements acknowledging or reaffirming the debt made to Mr. Ingram would have found their way to Mr. von Meiss in relatively short order.

Likewise, the trial court did not err by declining to give Mr. Earthman's proposed instruction concerning the substance of the statements required to revive a debt. This proposed instruction was unduly narrow because a cause of action on a note can be revived not only by an "unconditional promise to pay" but also by an acknowledgement of the debt coupled with an expression of willingness to pay. *See Hall v. Skidmore*, 180 Tenn. at 27, 171 S.W.2d at 275; *Warren v. Cleveland*, 111 Tenn. at 177, 76 S.W. at 910. The substance of the requested instruction was also adequately covered in other portions of the trial court's charge. Following its instructions on estoppel, the trial court charged the jury that

> A debt, a collection of which is barred by the statute of limitation, may also be revived. If Earthman acknowledged the debt and promised to pay Ingram after the six-year period expired then the debt was revived and the suit is not barred by the six-year statute of limitations. Ingram has the burden of proving the revival of the debt.

Mr. Earthman's chief objection to the trial court's instructions is that they permitted the jury to decide that statements or conduct occurring before March 24, 1988 could prevent him from asserting a statute of limitations defense. We agree that the instructions permit the jury to draw this conclusion, but we fail to see the error. Promises and statements made before the limitations period expired will support an estoppel claim, just as promises and statements made after the limitations period expired will support a revival claim. The trial court's estoppel and revival instructions, taken as a whole, adequately provided the jury with the legal principles needed to decide Mr. Earthman's statute of limitations defense. Accordingly, the trial court did not err by denying Mr. Earthman's requested instructions.

## C.

Mr. Earthman also asserts that the trial court gave two erroneous instructions that affected the outcome of the trial. The first instruction involved the permissible uses of the evidence involving Mr. Ingram's 1977 criminal conviction. The second instruction involves the elements of Mr. Ingram's estoppel claim.

### THE INSTRUCTION LIMITING THE USE OF MR. INGRAM'S CONVICTION

Mr. Earthman's challenge to the trial court's instruction limiting the jury's consideration of Mr. Ingram's 1977 conviction is puzzling. This instruction followed

the trial court's ruling that the conviction could not be used to impeach Mr. Ingram but that it could be used to illustrate the relationship between Messrs. Ingram and Earthman and to provide background information concerning the loan transaction itself. Even though Mr. Earthman has not directly challenged the trial court's evidentiary ruling, he takes issue with the instruction necessitated by the ruling. Mr. Earthman's failure to challenge the evidentiary ruling limiting the use of Mr. Ingram's criminal conviction prevents him from taking issue with the limiting instruction.

Were we to permit Mr. Earthman to collaterally attack the evidentiary ruling, we would find that the trial court properly determined that Mr. Ingram's 1977 conviction could not be used to impeach his credibility. Tenn. R. Evid. 609 permits using prior convictions to impeach a witness's credibility. However, evidence of a conviction that is more than ten years old cannot be used for impeachment unless the court first determines "that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." *See* Tenn. R. Evid. 609(b). The rule discourages the use of stale convictions for impeachment because they may no longer shed light on a witness's credibility. *See* Neil Cohen, et al., *Tennessee Law of Evidence* § 609.5 (3d ed. 1995) ("Tennessee Law of Evidence"). Thus, as a practical matter, the balancing test required by Tenn. R. Evid. 609(b) ordinarily results in the exclusion of the evidence of the stale conviction. *See* Robert E. Burch, *Trial Handbook for Tennessee Lawyers* § 16.11, at 220 (2d ed. 1995); Tennessee Law of Evidence, § 609.5, at 372-73.

Like other evidentiary rulings, appellate courts review a trial court's ruling under Tenn. R. Evid. 609(b) using an abuse of discretion standard. *See State v. Blanton*, 926 S.W.2d 953, 959-60 (Tenn. Crim. App. 1996). The reviewing court does not reweigh or re-evaluate the probative value and prejudicial effect of the prior conviction. *See State v. Roberts*, 943 S.W.2d 403, 408 (Tenn. Crim. App. 1996). The party desiring to use an old conviction has the burden of demonstrating that its probative value outweighs its prejudicial effect. *See United States v. Beahm*, 664 F.2d 414, 417-18 (4th Cir. 1981). Mr. Earthman has failed to carry his burden of proof and has failed to demonstrate how the trial court erred by preventing him from using the evidence of Mr. Ingram's 1977 conviction to impeach his credibility.

If the trial court decides to permit the introduction of evidence of a conviction of a party who was released from custody more than ten years before the action was commenced, it should instruct the jury concerning the permitted use of the evidence. *See* Tennessee Law of Evidence § 609.12. The trial court did precisely that when it instructed the jury that

> . . . this evidence about Mr. Ingram's conviction and being in prison is being admitted because it goes to the whole question of the loan and the relationship between the parties in the loan and any provisions that were or were not made for paying it back.
>
> And so I instruct you that you're not to consider this evidence about this conviction in Chicago as evidence of bad character on the part of Mr. Ingram, but only for the limited purpose of helping you understand the transaction that is involved in this suit.

Because we find no error with the trial court's evidentiary ruling, we find no error with its contemporaneous limiting instruction regarding the use of the evidence of Mr. Ingram's 1977 conviction.

## THE ESTOPPEL INSTRUCTION

Mr. Earthman also takes issue with the portion of the trial court's estoppel instruction in which the trial court stated:

> Earthman may also be estopped from relying on the statute of limitations if during the six-year period . . . he acknowledged his indebtedness to Ingram. An acknowledgment of the debt constitutes an implied promise to pay it.

He asserts that this instruction could have induced the jury to decide that he was estopped to assert his statute of limitations defense even in the absence of evidence that he expressed a willingness to pay the debt. This argument reflects confusion between the ingredients for an estoppel claim and a revival claim.

Estoppel claims do not require proof that the debtor has expressed a willingness to pay. Rather, they require proof that the maker's statements and conduct, made or occurring prior to the expiration of the limitations period, induced the holder of the note to believe that the maker either would not assert a statute of limitations defense or that the dispute would be settled amicably without litigation. Expressions of willingness to pay after the expiration of the limitations period are

necessary ingredients of a claim that an extinguished cause of action has been revived. *See Hall v. Skidmore*, 180 Tenn. at 27, 171 S.W.2d at 275.

Depending on the circumstances, a maker's acknowledgment of a debt could provide the basis for an estoppel claim if the manner in which the acknowledgment was made reasonably induced the holder to forego filing suit because of a belief that the maker would not assert a statute of limitations defense or that the maker intended to resolve the dispute without litigation. The trial court instructed the jury

> A party by his conduct or words may be estopped from relying on the statute of limitation as a defense. If Ingram was induced to believe that Earthman was going to pay the debt, or otherwise satisfy the debt, or reach some other amicable settlement of the debt and, in reliance on the conduct or words, Ingram delayed filing the suit within the applicable limitation period then Earthman is . . . estopped from relying on the statute of limitations as a defense or, stated another way, if Earthman by his conduct or words induced Ingram to believe that the debt would be paid, or otherwise satisfied, or that some other amicable settlement would be reached then . . . Ingram is excused from failing to file the suit within the six-year limitation period.

> \*          \*          \*

> Ingram must prove that he relied on Earthman's conduct and words and that his reliance was reasonable. Whether any reliance was reasonable is . . . for you, the jury, to decide from all the facts and circumstances introduced into evidence.

While the statement that "[a]n acknowledgment of the debt constitutes an implied promise to pay it" may have been imprecise enough to be misinterpreted by the jury, it should not be considered out of context. The trial court's estoppel instructions, taken as a whole, fairly informed the jury of Mr. Ingram's burden of proof and the essential ingredients of his estoppel claim. Accordingly, we find no reversible error in the trial court's estoppel instructions.

## VI.

Mr. Earthman also asserts that the special verdict form is fatally incomplete. He takes the trial court to task for not including questions concerning whether Mr. Ingram was the holder or owner of the note and whether the acts found by the jury to

excuse Mr. Ingram from filing suit occurred within the six-year limitations period. We find no reversible errors in the special verdict form.

Decisions regarding the use of a special verdict form and the questions to be included on the form are discretionary. *See* Tenn. R. Civ. P. 49; *Smith v. Parker*, 213 Tenn. 147, 159-60, 373 S.W.2d 205, 211 (1963). When a special verdict form is used, it should repeat and highlight the issues covered in the charge and should be couched in the same terms as the jury instructions. *See Concrete Spaces, Inc. v. Sender*, No. 01A01-9607-CH-00288, 1998 WL 430165, at *6 (Tenn. Ct. App. July 31, 1998) (Tenn. R. App. P. 11 application pending). Instructions and special verdict forms should be considered together to determine whether they present the contested issues to the jury in an unclouded and fair manner. *See Morton v. City of Chicago*, 676 N.E.2d 985, 990 (Ill. App. Ct. 1997); *Capers v. The Bon Marche*, 955 P.2d 822, 825 (Wash. Ct. App. 1998). Reversal is required only when the special verdict form is confusing or inconsistent with the trial court's instructions. *See Helmar v. Harsche*, 686 A.2d 766, 775 (N.J. Super. Ct. App. Div. 1996).

The trial court did not accept Mr. Earthman's proposed instruction concerning Mr. Ingram's status as a holder or owner of the note and did not include a corresponding question on the special verdict form. We have already found that the trial court did not commit reversible error by declining to give the requested instruction. Now we find that the trial court did not err by declining to include a question concerning Mr. Ingram's status as a holder or owner of the note on the special verdict form. The proof simply did not warrant including this question.

The facts surrounding the dealings between Messrs. Ingram and von Meiss in 1982 are straightforward. Mr. Ingram sent the original note and a separate, incomplete assignment form to Mr. von Meiss. By doing so, Mr. Ingram did not intend to relinquish all his interest in the note but rather intended that Mr. von Meiss, acting as his agent, would hold the note while Mr. Ingram decided what he wanted to do with it. The only conclusion that a reasonable fact-finder could draw from this evidence was that Mr. Ingram retained control over the note after January 1982 and did not lose his status as the owner or holder of the note. Therefore, the trial court properly declined to include a question on the special verdict form asking the jury to determine whether Mr. Ingram was the holder or owner of the note.

## VII.

In his penultimate issue, Mr. Earthman asserts that the trial court should not have submitted Mr. Ingram's claim for compound interest to the jury. He argues that determining whether a note bears simple or compound interest is a question of law and that the trial court should have concluded that the October 14, 1980 note required only simple interest. We disagree. The meaning of the interest rate provision in the note presented a jury question.

Compound interest is permissible in Tennessee as long as the parties have agreed to it. *See Woods v. Rankin*, 49 Tenn. (2 Heisk.) 46, 48 (1870); *Hale v. Hale*, 41 Tenn. (1 Cold.) 233, 236 (1860); *Waid v. Greer*, 56 S.W. 1029, 1029 (Tenn. App. 1900). In cases involving a promissory note, the parties' agreement concerning interest should be reflected in the note itself. Thus, the first place to look for the parties' agreement concerning interest is the note. If the interest provision in the note is unambiguous and consistent with other applicable legal requirements, it will be enforced as written as a matter of law. If, however, the interest provision is ambiguous, the fact-finder must look elsewhere to ascertain the parties' agreement concerning interest.

The interest rate provision in the October 14, 1980 note prepared by Mr. Earthman is far from clear. Read literally, it obligates Mr. Earthman to pay interest at Mr. Ingram's "prime rate" – that is, the rate of interest that Mr. Ingram charges his "most credit worthy customers for 90-day unsecured loans." The record contains no evidence establishing what Mr. Ingram's "Prime Rate" was. Thus, the fact-finder was required to look beyond the note to ascertain the parties' agreement concerning interest payments on this loan.

Parol evidence cannot be used to contradict or alter the terms of a written contract that is complete and unambiguous on its face. *See Jones v. Brooks*, 696 S.W.2d 885, 886 (Tenn. 1985); *Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 259 (Tenn. Ct. App. 1990). However, the parol evidence rule does not prevent the introduction and consideration of extraneous evidence to explain an ambiguous contractual provision. *See Faulkner v. Ramsey*, 178 Tenn. 370, 374-75, 158 S.W.2d 710, 711-12 (1942); *Faithful v. Gardner*, 799 S.W.2d 232, 235 (Tenn. Ct. App. 1990). Likewise, the use of parol evidence to explain a vague contractual term does

not cause an otherwise valid written agreement to run afoul of the Statute of Limitations in Tenn. Code Ann. § 29-2-101 (Supp. 1998).

The parties disagreed at trial concerning the meaning of the interest rate provision in the October 14, 1980 note. Mr. Earthman asserted that the note permitted only simple interest because it did not explicitly state that it bore compound interest. For his part, Mr. Ingram testified that the parties agreed that Mr. Ingram would not incur any additional expense if he agreed to make the $1,70,000 loan to Mr. Earthman. Thus, Mr. Ingram's version of the meaning of "Prime Rate" was that Mr. Earthman agreed to reimburse him for any interest expense he incurred as a result of the $1,700,000 loan. Mr. Ingram also presented evidence that the loans Mr. Earthman caused to be procured for him at United American Bank and the Banque d'l Union Europeene bore compound interest which he was eventually required to pay.

This conflicting evidence created a jury issue with regard to whether the October 14, 1980 note bore compound or simple interest. Accordingly, the trial court did not err by submitting this issue to the jury for resolution.

## VIII.

In his final issue, Mr. Earthman asserts that the jury's $5,667,122.84 verdict is excessive. He argues that Mr. Ingram was entitled, at most, to $2,729,675.95 – the sum Mr. Ingram paid to the Banque d'l Union Europeene in May 1983 because their agreement was that Mr. Ingram's agreement to make the $1,700,000 loan would not cost Mr. Ingram any money. Thus, he insists that he should not be required to pay Mr. Ingram an additional $3,937,446.92 which represents the simple interest on the $2,729,675.95 calculated at the prime rate from May 1983 to May 1995.

We find that Mr. Earthman's reliance on the parties' agreement that Mr. Ingram would incur no additional expense in this transaction is misplaced. At the time they entered into the original loan transaction in 1980, the parties contemplated that Mr. Earthman would repay Mr. Ingram's United American Bank loan plus interest when it became due in eighteen months. They did not contemplate that Mr. Earthman would cause the note to be renewed or to be sold to a foreign bank or that

Mr. Earthman would fail to repay the loan for over twelve years after its original due date.

Mr. Earthman conceded that he expected to pay Mr. Ingram principal and interest when he first borrowed the $1,700,000 in October 1980. Tenn. Code Ann. § 47-14-123 (1995) permits juries to award prejudgment interest as damages "in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum." The jury's decision to award Mr. Ingram simple interest calculated on his $2,729,675.95 payment to the Banque d'l Union Europeene is consistent with Tenn. Code Ann. § 47-14-123 and is supported by the evidence. Accordingly, we find that the jury's $5,667,122.84 verdict is not excessive.

## IX.

We affirm the judgment[22] and remand the case to the trial court for any further proceedings that may be required. We tax the costs of this appeal to William F. Earthman and his surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:


_____
SAMUEL L. LEWIS, JUDGE


_____
BEN H. CANTRELL, JUDGE

---

[22]Because we have affirmed the judgment based on Mr. Ingram's claims arising from the October 14, 1980 note, we pretermit the three issues raised by Mr. Ingram concerning the trial court's summary dismissal of his intentional and negligent misrepresentation claims and the calculation of interest should the case be remanded for a new trial.