# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
February 17, 2016 Session

## JAMES J. BOGNER, II v. VANDERBILT UNIVERSITY

**Appeal from the Circuit Court for Davidson County**
**No. 10C2109  Joseph P. Binkley, Jr., Judge**

_____

**No. M2015-00669-COA-R3-CV – Filed February 23, 2017**

_____

This is an appeal from a judgment entered on a jury verdict in favor of the defendant in a health care liability action.  The plaintiff filed suit against the defendant hospital for medical malpractice, medical battery, and lack of informed consent.  The trial court granted a partial directed verdict in favor of the defendant after the plaintiff presented evidence.  At the close of all the proof, the trial court denied the plaintiff's motion for a directed verdict on the remaining issues of medical battery and informed consent.  On appeal, the plaintiff claims that the trial court erred in denying the motion for a directed verdict, in refusing to adopt the plaintiff's special jury instructions, and in using a confusing special verdict form.  Discerning no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S. and BRANDON O. GIBSON, J., joined.

Jon E. Jones and Patrick Shea Callahan, Cookeville, Tennessee, for the appellant, James J. Bogner, II.

Thomas A. Wiseman, III, and Margaret Moore, Nashville, Tennessee, for the appellee, Vanderbilt University.

# OPINION

## I. FACTUAL AND PROCEDURAL BACKGROUND

At age 75, Mrs. Barbara Bogner began experiencing chest pain, and her physician referred her to a cardiologist for evaluation. The cardiologist performed a cardiac catheterization, which showed blockages in three coronary arteries. The cardiologist then referred her to Dr. James Greelish, a cardiothoracic surgeon at Vanderbilt University Medical Center ("Vanderbilt") for treatment.

Mrs. Bogner, accompanied by her husband and son, met with Dr. Greelish on March 30, 2006. Dr. Greelish showed Mrs. Bogner the film of her cardiac catheterization, explained the findings, and recommended cardiac artery bypass grafting. He discussed the risks of the procedure, provided the family with written materials, and answered all of their questions. At the end of the meeting, Mrs. Bogner reviewed and signed two consent forms.

One consent form was entitled, "Consent to Operation, Treatment or Other Procedure." By signing this consent form, Mrs. Bogner authorized "coronary artery bypass surgery to be performed by Dr. Greelish and staff." This operative consent form provided, in relevant part:

> The nature, advisability, and purpose of the operation, treatment, or other procedures have been explained to me, together with the benefits hoped to result and the material risks. Alternatives to the operation, treatment, or other procedure, if any, and the risks of such alternatives have been explained to me. I understand the explanations that have been given to me, and I understand that no guarantee is offered as to the results . . . .
>
> . . . .
>
> I understand that during the course of the operation, treatment, or other procedure, unforeseen conditions may be found that make an extension of the original operation, treatment, or other procedure advisable. I authorize and consent to such extension or other operation, treatment, or other procedure as it is advisable in the professional judgment of my physician or physicians.

2

The second consent form gave Vanderbilt doctors permission to review Mrs. Bogner's medical records as part of a research study. According to this form, Vanderbilt was conducting a "retrospective review of cardiac surgery followed by completion angiography and/or percutaneous coronary intervention[1] ('The Hybrid Approach')." The research study consent form provided, in part:

> 1. What is the purpose of this study?
>
> You are being asked to take part in this research study because you have had or will be having heart surgery. Your heart surgery was or will be done in a room that both surgery and heart catheterizations can be done during the same period of time. We call this room the "hybrid" suite. We want to collect data on how well this treatment works for heart patients. We would like to enroll 200 patients into this study.
>
> 2. What will happen and how long will you be in the study?
>
> We are asking for your permission to review your medical records. We want to review the data of your surgery in the hybrid suite. We would like to have access to these records for this purpose for a period of 10 years.
>
> . . . .
>
> 4. Side effects and risks that you can expect if you take part in this study:
>
> The only risk for taking part in this study is that private health information that will be collected could become known to others. This information will be stored in a password protected database that only the physician and the nurse have access to.

Mrs. Bogner was admitted to Vanderbilt on April 18, 2006, for coronary artery bypass grafting in Vanderbilt's hybrid suite. Upon admission, Mrs. Bogner signed a third consent form, entitled "Consent for Routine Diagnostic Procedure and Medical Treatment."

---

[1] Percutaneous coronary intervention involves the use of a balloon or a stent to remedy a blocked coronary vessel.

Immediately after Dr. Greelish completed the bypass grafts, Dr. David Hanson, a Vanderbilt cardiologist, performed a coronary angiogram[2] that revealed a severe restriction in one of the bypass grafts that was impeding the blood flow to the attached coronary artery. Dr. Hanson, in conjunction with Dr. Greelish, determined that a balloon angioplasty[3] was medically necessary because Mrs. Bogner was at a high risk of suffering additional heart damage due to insufficient blood flow to her heart. Dr. Mark Glazer, an interventional cardiologist, performed the balloon angioplasty to open the bypass graft.

Mrs. Bogner did not recover from surgery as expected and remained hospitalized at Vanderbilt until May 30, 2006, when she was transferred to a rehabilitation hospital. Eventually, Mrs. Bogner was discharged and returned home. Thereafter, she experienced a variety of medical conditions that required treatment, including dialysis.

Mrs. Bogner initially filed a healthcare liability action against Vanderbilt on April 17, 2007. After taking a voluntary nonsuit, she filed this action in the Circuit Court for Davidson County, Tennessee, on June 8, 2010. While the case was pending, Mrs. Bogner died of causes unrelated to the Vanderbilt surgery, and James Bogner, her son and the administrator of her estate, was substituted as plaintiff.

This case was tried before a jury for seven days. At the end of Plaintiff's case in chief, Vanderbilt moved for a directed verdict on all issues. The court granted the motion on all issues except for informed consent and medical battery. After both sides concluded their proof, Vanderbilt renewed its request for a directed verdict, which the court denied. Plaintiff also moved for a directed verdict on the issues of informed consent and medical battery. The court denied Plaintiff's motion as well and the case proceeded to the jury.

A. PROOF AT THE TRIAL

1. Plaintiff's Proof

Mrs. Bogner testified in a deposition videotaped before her death that she only consented to coronary artery bypass grafting, not to a completion angiogram[4] or balloon

---

[2] According to testimony, a coronary angiogram is a picture of the heart obtained through the use of a radiographic dye or contrast solution that provides a "roadmap," which identifies the location and severity of any blockages.

[3] According to the testimony, in a balloon angioplasty, a cardiologist inserts a balloon into a restricted vessel and inflates it at the site of the obstruction thus dilating the vessel and pressing any blockage against the vessel wall.

[4] According to the testimony, a completion angiogram is the name for a coronary angiogram performed immediately after coronary artery bypass grafting.

angioplasty. She only remembered discussing coronary artery bypass grafting with Dr. Greelish and denied any knowledge of a research study, the hybrid suite, or an experimental surgery.

Mr. Bogner also maintained that Dr. Greelish's discussion with his mother was limited to the risks of coronary artery bypass grafting. According to Mr. Bogner, "we thought she was having normal bypass surgery." He conceded that his parents were given the opportunity to ask questions and that Dr. Greelish answered all their questions to their satisfaction. He also agreed that, at the meeting with Dr. Greelish, his mother reviewed and signed consent forms for both the operation and the research study.

Plaintiff's expert witness, Dr. George Feldman, testified that undergoing coronary artery bypass grafting in the hybrid suite increased Mrs. Bogner's risk of injury. In his opinion, the standard of care required Dr. Greelish to disclose that Mrs. Bogner's surgery was experimental and involved additional risks. He reviewed the consent forms that Mrs. Bogner signed and opined that none of them met the standard of care for obtaining informed consent. According to Dr. Feldman, the operative consent form was limited to coronary artery bypass grafting and did not include the completion angiogram. In his view, the research study consent form misled Mrs. Bogner about the risks involved in her surgery. Finally, Dr. Feldman testified that the consent form for routine treatment that Mrs. Bogner signed upon admission to the hospital did not cover experimental procedures.

Dr. Hanson and Dr. Glazer agreed with Dr. Feldman that coronary artery bypass grafting immediately followed by a completion angiogram was experimental in 2006 and entailed additional risks that should have been disclosed to Mrs. Bogner. Two other Vanderbilt physicians, while disputing whether the hybrid procedure was experimental, conceded that the standard of care required that a physician inform Mrs. Bogner of the additional risks associated with undergoing bypass surgery in the hybrid suite.

Dr. Glazer identified the research study consent form as the form authorizing the performance of bypass grafting in the hybrid suite and agreed that the form misrepresented the risks.

2. Vanderbilt's Proof[5]

a. Coronary Artery Bypass Grafting in The Hybrid Suite

Cardiac artery bypass grafting involves using portions of the patient's other blood vessels to create detours around blockages in coronary arteries, thereby increasing blood flow to the heart. According to the Vanderbilt witnesses, a known percentage of patients who undergo bypass grafting that appeared successful at the time of the surgery will subsequently exhibit symptoms of graft failure, a potentially fatal cardiac event. In those patients who received a bypass graft formed from part of a leg vein,[6] fifteen to thirty percent will experience sluggish or no blood flow at the graft site by the end of the first year after the surgery.

If a surgeon suspects possible graft failure, a coronary angiogram is necessary so that the surgeon can visualize the blood flow inside the cardiac blood vessels and determine the location and extent of the problem. Because coronary angiograms require specialized equipment, these procedures are generally performed in a cardiac catheterization laboratory.

In 2005, Vanderbilt constructed a hybrid procedural suite, combining the tools of a cardiac catheterization laboratory and an operating room. The design of the hybrid suite allowed Vanderbilt physicians to perform multiple cardiovascular procedures in one location, thereby eliminating the additional risks of transporting patients from one location to another.

When coronary artery bypass grafting was performed in Vanderbilt's hybrid suite, a completion angiogram immediately followed the insertion of the bypass graft. The angiogram enabled the surgeon to accurately determine whether the grafts were successful. Proof at the trial established that cardiothoracic surgeons scheduled bypass surgeries in the hybrid suite if they determined that their patient would benefit from the opportunity to check the grafts before the patient left the operating room. These patients were generally those with higher risk factors for graft failure. As Dr. David Zhao, director of Vanderbilt's cardiac catheterization laboratory, explained: "So based on the clinical needs, the patient's condition, they will make a call who goes to the hybrid and who goes to the regular OR. So that's how it's being done."

---

[5] By the time of the trial, Dr. Greelish no longer lived or worked in Tennessee. He did not testify in person. Instead, Plaintiff played Dr. Greelish's video-deposition for the jury. Dr. Greelish's deposition testimony did not address the issues of informed consent or medical battery.

[6] According to the testimony, the determination as to which blood vessels are used as bypass grafts depends on the location of the blockage.

Dr. Rashid Ahmad, a cardiothoracic surgeon who performed cardiac artery bypass grafting in Vanderbilt's hybrid suite, testified that in his medical opinion Mrs. Bogner was the type of high risk patient that the hybrid suite was designed to benefit. Her pre-operative cardiac catheterization had revealed multiple diffuse blockages requiring the use of several blood vessels as grafts, including both leg veins.

b. The Vanderbilt Research Study

By 2006, Vanderbilt had received approval for a retrospective research study that collected data from patients who had coronary artery bypass grafting followed by a completion angiogram to determine whether these patients experienced a better outcome than the historical studies. Because the study required Vanderbilt researchers to access private medical information, the study had to be approved by Vanderbilt's Institutional Review Board,[7] and all participants were required to sign a consent form.

Dr. Todd Rice, a member of the Vanderbilt Institutional Review Board, testified that the Vanderbilt study involved data collection, not treatment. After a physician decided that coronary artery bypass grafting followed by a completion angiogram was clinically indicated for a patient, that patient was eligible for participation in the research study. By signing the research study consent form, Mrs. Bogner allowed Vanderbilt to collect data from her medical records and include it in the research record for the study. According to Dr. Rice, the consent form accurately disclosed the risks of participation in a data collection study.

Dr. Zhao, the principal investigator of the study, agreed that the cardiothoracic surgeon made the decision of whether a completion angiogram was necessary for a particular patient. He reiterated that participation in the study had no effect on the patient's clinical care. Dr. Ahmad, a co-investigator, testified that the purpose of the study was to evaluate the efficacy of performing coronary artery bypass grafting in the hybrid suite. He agreed that a patient was only asked to participate in the study after the patient's clinical care had been decided.

c. The Consent Form

Dr. Zhao explained that the patient's consent for bypass grafting followed by a completion angiogram was evidenced by the operative consent form. Although the form did not specifically mention a completion angiogram, Dr. Zhao insisted that consent to coronary artery bypass grafting included consent for a coronary angiogram.

---

[7] Under federal law, medical research on humans must be supervised by an institutional review board. *See* 42 U.S.C.A. § 289; *see also* 45 C.F.R. § 46.109, 46.102(f) (defining research on human subjects to include research involving access to identifiable private information).

Dr. Ahmad agreed that he discussed the risks and benefits of the hybrid procedure with his patients before they signed the operative consent form. According to Dr. Ahmad, the words "completion angiogram" did not have to be added to the form because the risks of that part of the bypass grafting procedure were covered in his discussion with the patient.

Dr. Rice also testified that it was unnecessary to include the words "hybrid suite" in the operative consent form. The additional risks of bypass grafting in the hybrid suite were included in the discussion between the doctor and the patient. In his opinion, consent was a "dynamic process," and it was customary for physicians to provide additional information to patients beyond what was written on the consent forms.

Dr. Hanson testified in a similar fashion. In his experience, a written consent form for medical treatment did not generally incorporate everything discussed between the physician and the patient before signing the document.

Vanderbilt's expert witness, Dr. John Bright Cage, testified that Mrs. Bogner's consent was properly obtained for her procedure. According to Dr. Cage, the details of the additional risks of undergoing the hybrid bypass procedure would have been part of the discussion with the patient. He opined that a separate consent form for the completion angiogram was unnecessary because the angiogram was simply one part of the coronary artery bypass grafting procedure. He explained that although numerous procedures take place during coronary artery bypass grafting, none of the included procedures necessitated a separate consent form.

## B. THE JURY VERDICT

At the conclusion of the proof, Plaintiff requested several special jury instructions, which the court denied. Plaintiff also objected to the court's proposed jury verdict form and submitted an alternative, which the court did not adopt.

The jury returned a verdict for Vanderbilt. The court polled the jury members, and each juror affirmed that he or she agreed with the verdict. Accordingly, the court issued a judgment in accordance with the jury's verdict. The court denied Plaintiff's subsequent motion for a new trial.

## II. ANALYSIS

Plaintiff raises three issues on appeal. First, Plaintiff contends the trial court erred in denying her motion for a directed verdict on the issues of informed consent and medical battery. Second, she challenges the trial court's refusal to include four special jury instructions in the jury charge. Finally, Plaintiff argues that the special verdict form was confusing and misled the jury.

## A. DENIAL OF THE PLAINTIFF'S MOTION FOR DIRECTED VERDICT

The appeal of a motion for a directed verdict requires this Court to answer one question: whether the non-moving party presented enough material evidence to create an issue of fact for a jury to resolve. *Burton v. Warren Farmers Coop.*, 129 S.W.3d 513, 520 (Tenn. Ct. App. 2002). Materiality does not refer to the weight of the evidence but to its "relationship between the proposition that the evidence is offered to prove and the issues in the case." *Kelley v. Johns*, 96 S.W.3d 189, 194 (Tenn. Ct. App. 2002). In reviewing the trial court's decision, we

> must take the strongest legitimate view of the evidence in favor of the non-moving party, construing all evidence in that party's favor and disregarding all countervailing evidence. A motion for a directed verdict should not be granted unless reasonable minds could reach only one conclusion from the evidence. The standard of review applicable to a motion for a directed verdict does not permit an appellate court to weigh the evidence. Moreover, in reviewing the trial court's denial of a motion for a directed verdict, an appellate court must not evaluate the credibility of witnesses. Accordingly, if material evidence is in dispute or doubt exists as to the conclusions to be drawn from that evidence, the motion must be denied.

*Johnson v. Tenn. Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006) (citations omitted).

Plaintiff claims Vanderbilt is liable for Mrs. Bogner's injuries under two related and yet distinct causes of action: medical battery and lack of informed consent. As our Supreme Court has noted, "there is a distinction between: (1) cases in which a doctor performs an unauthorized procedure; and (2) cases in which the procedure is authorized but the patient claims that the doctor failed to inform the patient of any or all the risks inherent in the procedure." *Blanchard v. Kellum*, 975 S.W.2d 522, 524 (Tenn. 1998).

Medical battery cases involve consideration of two questions: (1) "was the patient aware that the doctor was going to perform the procedure"; and, if so, (2) "did the patient authorize performance of the procedure?" *Id.* The "answers to these questions focus on the patient's knowledge and awareness." *Church v. Perales*, 39 S.W.3d 149, 159 (Tenn. Ct. App. 2000).

If, however, a patient alleges that "the doctor failed to inform [him or her] of any or all risks or aspects associated with a procedure, the patient's cause of action rests on an informed consent theory." *Blanchard*, 975 S.W.2d at 524. In an informed consent case,

9

"the inquiry focuses on whether the doctor provided *any* or *adequate* information to allow a patient to formulate an intelligent and informed decision when authorizing or consenting to a procedure." *Id.* (emphasis in original). A physician's misrepresentation of a material fact will vitiate consent. *Holt v. Alexander*, No. W2003-02541-COA-R3-CV, 2005 WL 94370, at *6 (Tenn. Ct. App. Jan. 13, 2005).

1. Medical Battery

The analysis under Plaintiff's medical battery theory is straightforward. We must determine whether this record contains material evidence from which a jury could conclude that Mrs. Bogner was aware her doctor was planning to perform her coronary artery bypass surgery in the hybrid suite, which included a completion angiogram, and that she authorized the procedure.[8] *Blanchard*, 975 S.W.2d at 524.

Vanderbilt argued that Mrs. Bogner admitted in both her amended complaint in her original action and in her re-filed complaint in 2010 that she knew she was scheduled to have a completion angiogram. Admissions in pleadings may be used against a party as substantive evidence at trial. *See Pankow v. Mitchell*, 737 S.W.2d 293, 296 (Tenn. Ct. App. 1987). In the amended complaint, after describing the research study at Vanderbilt, Mrs. Bogner alleged: "Vanderbilt asked Mrs. Bogner to participate in this study. Participation meant that Mrs. Bogner would undergo an angiogram immediately after [coronary artery bypass grafting]." Again, in her 2010 complaint, Mrs. Bogner described the Vanderbilt research study and alleged:

> Vanderbilt asked Mrs. Bogner to sign a consent form evidencing her agreement to take part in the experimental hybrid study. A copy of this signed form is attached as part of this complaint. In reliance on the false information supplied to her, Mrs. Bogner signed the consent form.

Mrs. Bogner's son testified that she discussed her bypass surgery with Dr. Greelish, she had an opportunity to ask questions, and the doctor answered all of her questions. Mrs. Bogner read and signed both the operative consent form and the research study consent form during her March 30 meeting with Dr. Greelish. "[T]he law presumes that persons who sign documents, having been given an opportunity to read them, are bound by their signatures." *Church*, 39 S.W.3d at 161.

The research study consent form indicated that Vanderbilt was studying "cardiac surgery followed by completion angiography." The form expressly provided that

---

[8] Vanderbilt was not required to obtain Mrs. Bogner's consent for the balloon angioplasty because the procedure was necessitated by a medical emergency while she was under sedation. *Shadrick v. Coker*, 963 S.W.2d 726, 733 (Tenn. 1998).

10

Mrs. Bogner was being asked to participate in the study because she was having her bypass surgery in the hybrid suite, which was equipped with the tools to perform a cardiac catheterization. Mrs. Bogner acknowledged in the form that she had "read this consent form and the research study ha[d] been explained to me verbally." She also acknowledged that "[a]ll my questions have been answered, and I freely and voluntarily choose to take part in this study." Regardless of whether the form misrepresented the risks of surgery, the form provided sufficient evidence that Mrs. Bogner knew she was having bypass surgery in the hybrid suite.

By signing the operative consent form, Mrs. Bogner authorized the performance of "coronary artery bypass surgery to be performed by Dr. Greelish and staff." While the form did not explicitly state that the bypass surgery would occur in the hybrid suite and involve a completion angiogram, three Vanderbilt doctors testified that those details would have been included in Dr. Greelish's discussion of the surgery with Mrs. Bogner. A written consent form does not preclude "the admission of parole evidence to show that the patient verbally consented to procedures *in addition* to those specified in the consent form." *Bates v. Metcalf*, No. E2001-00358-COA-R3-CV, 2001 WL 1538535, at *6 (Tenn. Ct. App. Dec. 3, 2001) (emphasis in original). Vanderbilt was not required to produce a written consent form with the words "completion angiogram" or "hybrid suite" to create an issue of fact for the jury.

In our role as an appellate court, we are not to re-weigh the evidence. Based on this record, we conclude that a jury could reasonably find that Mrs. Bogner was aware of the hybrid nature of her bypass surgery and that she authorized the procedure. Consequently, the trial court did not err in refusing to grant Plaintiff a directed verdict on medical battery.

2. Informed Consent

In an informed consent case, the plaintiff must prove: "(1) what a reasonable medical practitioner in the same or similar community would have disclosed to the patient about the risk posed by the proposed procedure or treatment; and (2) that the defendant departed from the norm." *Ashe v. Radiation Oncology Assocs.*, 9 S.W.3d 119, 121 (Tenn. 1999); *see also* Tenn. Code Ann. § 29-26-118 (2012). Here, Plaintiff established through expert testimony that having a completion angiogram in the hybrid suite immediately following the bypass surgery entailed additional risks and the standard of care required that someone disclose and explain these risks to Mrs. Bogner before she consented to the procedure.

To counter Plaintiff's claim that Vanderbilt misrepresented the risks associated with the hybrid procedure in the research study consent form, Vanderbilt presented testimony that the research study consent form was solely for data collection. According to these witnesses, the consent form was not misleading and properly described the risks

11

of participation. Vanderbilt asserted that Mrs. Bogner consented to the performance of the hybrid procedure in the operative consent form.

Dr. Cage explained that coronary artery bypass grafting is a procedure with multiple component parts. Dr. Greelish would have discussed all parts of the procedure with Mrs. Bogner. The standard of care did not require multiple consent forms or a listing of each part of the procedure on the written consent form. In his expert opinion, Mrs. Bogner consented to the procedure she received.

Dr. Hanson explained that a consent form for medical treatment represented the culmination of extensive communication between the surgeon and the patient. Dr. Rice agreed that the hybrid nature of Mrs. Bogner's surgery would have been part of the discussion between Dr. Greelish and Mrs. Bogner. Dr. Zhao explained that part of obtaining consent for the bypass surgery in the hybrid suite included a discussion of the risks and benefits of a completion angiogram. Dr. Ahmad testified that the standard of care did not require Dr. Greelish to specify on the consent form itself that he had discussed the performance of a completion angiogram with Mrs. Bogner.

Mrs. Bogner agreed in the operative consent form that Dr. Greelish had explained the "nature, advisability, and purpose" of her surgery along with "the benefits hoped to result," the "material risks," and the alternative treatments. In the research study consent form, Mrs. Bogner acknowledged that the research study was explained to her and all her questions were answered. Her son conceded that she had time to review both documents and ask questions before signing.

Taking the strongest legitimate view of the evidence in Vanderbilt's favor, and disregarding all counter-vailing evidence, we conclude that a jury could reasonably find that Mrs. Bogner had enough information to make an informed decision about her treatment. Accordingly, we find no error in the trial court's denial of Plaintiff's motion for a directed verdict on informed consent.

B. JURY INSTRUCTIONS

We next consider the trial court's denial of Plaintiff's request for special jury instructions. The trial court had a duty to instruct the jury regarding every factual issue and theory for recovery that was raised by the pleadings and supported by the evidence. *Johnson*, 205 S.W.3d at 372. "Where a special instruction that has been requested is a correct statement of the law, is not included in the general charge, and is supported by the evidence introduced at trial, the trial court should give the instruction." *Spellmeyer v. Tenn. Farmers Mut. Ins. Co.*, 879 S.W.2d 843, 846 (Tenn. Ct. App. 1993).

On appeal, we review "the jury charge in its entirety and consider the charge as a whole in order to determine whether the trial judge committed prejudicial error."

*Johnson*, 205 S.W.3d at 372. The trial court did not err if the substance of the requested instructions was covered in the general instructions. *Id.* We will not reverse the judgment unless "the improper denial of a request for a special jury instruction has prejudiced the rights of the requesting party." *Id.* Plaintiff must affirmatively show that the refusal to grant the requested instruction affected the result of the trial. *Id.*

We conclude that the trial court did not err in denying Plaintiff's request for special jury instructions. In each instance, the substance of the requested instruction was covered in the general instructions provided to the jury. In Special Request No. 1, Plaintiff requested that the trial court instruct the jury as follows:

> Ladies and Gentlemen, I further charge you that if a person consenting to surgery is induced to consent by a substantial mistake regarding the extent of the harm to be expected from the surgery and the mistake is known, or should have been known by the healthcare provider, the patient's consent to undergo the surgery is void. Without effective consent, the surgery constitutes a battery.

However, the trial court's general charge instructed the jury that, if Plaintiff claimed Mrs. Bogner's consent was invalidated by misrepresentation or inadequate disclosure, she had stated a claim for medical battery.

In Special Request No. 2, Plaintiff proposed the following special instruction:

> Ladies and Gentlemen, I further charge you that if a proposed procedure is experimental, the patient must be informed of that fact. If the patient is not so informed, the patient's consent to undergo the procedure is void and the procedure constitutes a battery.

The substance of this special request was also covered in the general jury charge. The trial court provided a definition of experiment and instructed the jury that before a patient could give informed consent, the patient must be informed "if applicable, that the proposed treatment or procedure is experimental." The trial court also instructed the jury that failure to provide the required information to the patient negated the consent for treatment and constituted a battery.

Plaintiff's Special Request No. 6 was adequately covered by the explanation of the law of informed consent included in the general jury charge. Special Request No. 6 included the following language:

> Ladies and Gentlemen if you find that the "1-stop Hybrid

13

Surgery" was a significantly different surgery than the coronary artery bypass surgery Mrs. Bogner consented to undergo, then the "1-stop Hybrid Surgery" consent for the coronary artery bypass surgery would not cover the "1-stop Hybrid Surgery."

The trial court instructed the jury that, before providing treatment, a physician has the duty to disclose information about the particular treatment and its potential risks and alternatives to enable the patient to make an intelligent choice as to whether to submit to the treatment. The court continued that inadequate disclosure would invalidate a patient's consent and state a claim for battery.

Finally, the substance of Plaintiff's Special Request No. 9 was also included in the general charge. Plaintiff's Special Request No. 9 provided as follows:

Ladies and Gentlemen, I charge you that a patient may bring a valid lack of informed consent claim regardless of whether the subject-surgery was properly performed and the overall result is beneficial to the patient.

But the court instructed the jury: "A surgical operation on the body of a person is a battery, regardless of its results, unless the person consents to it."

C. JURY VERDICT FORM

Plaintiff's final issue is that the trial court used a confusing jury verdict form. *See* Tenn. R. Civ. P. 49.01. Special verdict forms should parallel the issues covered by the jury charge. *Ingram v. Earthman*, 993 S.W.2d 611, 640 (Tenn. Ct. App. 1998). We review the jury instructions and the special verdict form together "to determine whether they present the contested issues to the jury in an unclouded and fair manner." *Id.* Although trial courts have wide latitude in the use of special verdict forms, we will order a new trial "when verdict forms are composed in such a faulty fashion that they do not address each of the plaintiffs' theories of recovery and do not allow the jury to adequately respond to each claim." *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 911 (Tenn. 1999); *Stanfield v. Neblett*, 339 S.W.3d 22, 40 (Tenn. Ct. App. 2010).

Plaintiff's claim of prejudice is premised on the initial question of the verdict form, which provided as follows:

1. Did the coronary artery bypass grafting ("CABG") followed by intraoperative completion angiography and, if necessary, the angioplasty (the "1 Stop Hybrid") performed by the agents of Defendant Vanderbilt University Medical

14

Center on Mrs. Barbara M. Bogner constitute one medical procedure?

_____ YES                          _____ NO

If your answer to Question 1 is "YES", please answer Question 2. If you answered "NO", stop here, answer no further questions, have the presiding juror sign and date this form, and return it to the Court.

According to Plaintiff, although it answered the question in the affirmative, the jury failed to comprehend the significance of the initial question, and the jury's confusion led to an incorrect verdict for Vanderbilt.

Plaintiff's only evidence of jury confusion is a handwritten notation on the completed jury verdict form. In the medical battery section, the jury was asked two questions: (1) was Mrs. Bogner aware that Vanderbilt was going to perform the medical procedure and (2) did Mrs. Bogner authorize the medical procedure? The jury answered "yes" to both questions. Next to the second question, the jury wrote "explained, signed."

We find Plaintiff's argument that this notation indicated jury confusion over the meaning of one medical procedure unavailing. As previously discussed, Vanderbilt presented sufficient evidence at trial from which the jury could conclude that Dr. Greelish explained the hybrid nature of the bypass surgery during his meeting with Mrs. Bogner and that she authorized that procedure when she signed the operative consent form.

It has long been the law in Tennessee that, whether a plaintiff seeks recovery under a medical battery or an informed consent theory, the plaintiff must establish causation. *See Clifford v. Tacogue*, No. M2009-01703-COA-R3-CV, 2010 WL 2712534, at *4 (Tenn. Ct. App. July 8, 2010) (citing *Shadrick v. Coker*, 963 S.W.2d 726, 732 (Tenn. 1998); *Range v. Sowell*, No. M2006-02009-COA-R3-CV, 2009 WL 3518176, at *8 (Tenn. Ct. App. Oct. 29, 2009)). Because Plaintiff could not prove whether Mrs. Bogner's injuries resulted from the coronary artery bypass grafting or the completion angiogram and balloon angioplasty, the trial court determined that she could only establish causation if the April 18, 2006 surgery was one medical procedure.[9]

_____

[9] Plaintiff argued that the trial court should have adopted comment h to § 892A of the Restatement 2d of Torts, which provides as follows:

> *h. Exceeding privilege.* If the actor exceeds the consent given, the consent does not protect him from liability for the excess. When, as is normally the case, the harm caused by the excess is severable from that resulting from the privileged act, the actor is subject to liability only for the excess. Thus if there is consent to an entry on land for a proper

Accordingly, we find no error in the use of the special verdict form. The form was consistent with the jury charge, addressed both medical battery and informed consent, and allowed the jury to fully consider and respond to Plaintiff's claims. When polled, each juror agreed with the verdict.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of trial court and remand this case for further proceedings consistent with this opinion.

_____
W. NEAL MCBRAYER, JUDGE

---

purpose and the actor enters for that purpose and subsequently commits an unpermitted tort upon the premises, he becomes liable for the subsequent tort but not for the original entry. (See § 214). In any case in which it is impossible as a practical matter to sever the harm resulting from the excess from that caused by permitted act, the actor is subject to liability for the entire harm. (See, for example, Illustration 1 above).

Restatement (Second) of Torts § 892A (1979). Here, the jury found that Mrs. Bogner gave her informed consent for the hybrid procedure. Consequently, we conclude it is unnecessary to reach this issue.